IN RE ESTATE OF FRIEDA DOBALS, Deceased.

JOHN SCHULTZ et al., Appellants, v. B. S. ANDRESON, Appellee.

**WILLS:   Validity—Testator's Understanding of English Language.**
1   Record reviewed, and, aided by the presumption that deceased is presumed, from the act of signing the instrument, to know what it contained, held insufficient to justify submission to the jury of the question whether deceased could sufficiently understand the English language to understand the will and what she was doing at the time of its execution.

**WILLS:   Validity—Undue Influence—Presence of Beneficiary.** The
2   mere fact that a beneficiary under the will was present when it was executed, and talked to testatrix in her native language (German) as to the terms of her will, is not sufficient to justify submission to the jury of the question of undue influence, when the record, without dispute, reveals the fact that the scrivener first obtained the terms of the will from testatrix in English and correctly embodied the same in the will.

**WILLS:   Testamentary Capacity—Evidence—Unreasonableness of**
3   Instrument. The *unreasonable* features of a will may, in a proper case and along with other evidence, have bearing on the question of testamentary capacity and undue influence. Record reviewed, and *held* to be such that the jury ought not to be permitted to consider the instrument in question for any such purpose.

*Appeal from Crawford District Court.*—M. E. HUTCHISON, Judge.

FRIDAY, APRIL 7, 1916.

REHEARING DENIED WEDNESDAY, JUNE 28, 1916.

THIS is a will contest over the admission to probate of an instrument purporting to be the last will and testament of

one Frieda Dobals, deceased, upon objections filed by some of
her children. The cause was tried to a jury, and, at the con-
clusion of all the evidence, on motion of the proponent, a ver-
dict was returned, by direction of the court, sustaining the
instrument as the last will of deceased, and it was admitted
to probate, and B. S. Andreson, the party named in the will,
was appointed executor. From that action of the court, con-
testants have appealed.—*Affirmed.*

*Sims & Kuehnle,* for appellants.

*J. P. Conner,* for appellee.

PRESTON, J.—1. At the time the will was drawn, the tes-
tatrix, who was a widow about 60 years of age, lived alone
in a house at Schleswig, Iowa. She was a German lady, but
had lived in this country many years. She
owned a farm and some small amount of other
property in addition. One B. S. Andreson, a
banker at Schleswig, had acted as her adviser
in business matters. When she thought of making a will, she
requested Andreson to call Mr. White, an attorney at Ida
Grove, to draw the will for her. Mr. White had drawn her
husband's will and had looked after some affairs for the fam-
ily. Mr. White arrived in Schleswig, stopped at the bank to
see Mr. Andreson, who had called him, and they went together
to the home of deceased. She was up and around the house,
but not feeling very well.

    The principal point relied upon by contestants is as to
whether deceased could understand the English language well
enough to understand the will, and what she was doing at the
time of its execution. The evidence on this point will be
referred to more particularly later in the opinion. The will
was written in English and is dated August 1, 1913. She
died the 24th of the same month. At the time of the execu-
tion of the will, the record shows, we think without conflict,
that she told Mr. White in English the disposition she wanted

*1. WILLS: valid-*
*ity: testator's*
*understanding*
*of English lan-*
*guage.*

to make of her property, and Mr. White wrote it out. Then while Mr. White was writing, she talked the provisions over with Mr. Andreson in German, which was her native tongue, and then Mr. Andreson told Mr. White in English what she had told him in German. Mr. White says it was the same as what he had understood previously from her in English. The will was prepared in this way, a paragraph at a time, and when it was finished, it was read over to her, and a neighbor, Mr. Jacobson, was called in, who, with Mr. White, witnessed the execution of the will on the part of the testatrix.

The will was filed in the clerk's office on August 27th, by B. S. Andreson, the proponent. By its terms, said Andreson, who was her banker as well as a member of and officer in the Evangelical Church of Peace in Schleswig, and who was present at the time the instrument was drawn, was given $500. The said Church of Peace and two of its pastors were each given $500. The daughter Ida testifies that her mother was a church member. Two of her children were given $5 each; three others, $500 each; a granddaughter, an infant daughter of her son Herman, was given $10,000 in trust; and one daughter, the rest and residue of the estate. The said Andreson was named as executor and given control and management of the estate during the minority of the infant.

In 1894, deceased and her first husband, one Schultz, separated, and there was a divorce, some of the children siding with the father and some with the mother. Four of the children filed objections to the probate of the will, but three of them withdrew, and another daughter joined in the contest; so that, as the case went to trial, the objectors were a daughter Ida, who lived in China, and a son, John Schultz, who were the only contestants. These are the two who received but $5 each by the will. Ida testifies that her brother John had mistreated his mother and sided with the father; that Ida also sided with the father and was not on very friendly terms with her mother.

It is admitted that, so far as the formal execution. of the will is concerned, there was no dispute. The objections against the probate were the lack of mental capacity to make a will, and undue influence. There was no evidence, and it is not claimed by appellant, that under the testimony there was a showing that deceased was of unsound mind, in the sense, as appellant puts it, that she was not able to reason and deliberate and understand in the German language. The contention is, as they state it, that it did appear that there was a question as to whether she had the mind required—that is, the knowledge of the English language required—to make the disposition of her property in English that was made in the will in this case; that, because of her imperfect understanding of the English language, she did not comprehend and understand the terms of the will as written. There is no evidence whatever that there was, in fact, any undue influence attempted or used at the time of the execution of the will. There was no fiduciary relation between deceased and the attorney who drew the will, and, as.stated, the real contention is as to whether deceased understood the will drawn in English, and whether, from the circumstances of the case and the relation existing between deceased and Mr. Andreson, one of the beneficiaries, there was enough to take the case to the jury on the question of undue influence.

Counsel for appellants say that they are not concerned so much in this case with the burden of proof on the question of the execution of the will, and 'we do not understand them to contend that there was such a fiduciary relation between deceased and any of the parties concerned in the will as to shift the burden; but, if that is their claim, we think it cannot be sustained. Some of the cases hold, in effect, that where a testator is old and feeble, but the evidence is not sufficient to show mental incapacity to make a will, and there are peculiar circumstances surrounding the parties, such weakened mental condition and circumstances indicating undue influence may be coupled together in such a way as that it may be said

that, under the whole record, the transaction is not the real and valid act of the person. It is conceded that there is, in the first place, a presumption from the fact of signing the will that deceased knew what it contained. *Ross v. Ross,* 140 Iowa 51; *Keithley v. Stafford,* 126 Ill. 507. Ordinarily, the party alleging undue influence has the burden of proving it. *Hanrahan v. O'Toole,* 139 Iowa 229; *Gates v. Cole,* 137 Iowa 613. And we have held that advice and solicitation are not enough to establish undue influence. *Gates v. Cole,* supra; *Townsend v. Townsend,* 128 Iowa 621; *Chambers v. Brady,* 100 Iowa 622.

Proof of disposition and opportunity is not enough to establish undue influence. *Fothergill v. Fothergill,* 129 Iowa 93. But, as we have already stated, there is no evidence in this case that there was any solicitation on the

2. WILLS: validity: undue influence: presence of beneficiary.

part of anyone, at or before the execution of this will, to influence or induce testatrix to execute it, or to execute it in any particular way. The only point claimed here is that, because Andreson was present and talked with deceased in German and was a beneficiary, this is enough; but, as we have already stated, the evidence is undisputed that the attorney, Mr. White, who drew the will, got his information from deceased in English; that, while he was drawing the different paragraphs, deceased talked it over with Mr. Andreson in German, and that Mr. Andreson told the attorney what she had said, and that it was the same as she had told Mr. White.

Appellant cites authorities, and it is undoubtedly the law, that one who is incapable of exercising judgment, reason and deliberation, and understanding the consequence of his will to a reasonable degree and its effect upon his relatives and estate, has not sufficient mental capacity to make a valid will. They cite, among other cases, *Bever v. Spangler,* 93 Iowa 576, where the rule is, perhaps, more accurately stated, and they say that the testator must know the contents of his will in order to understand the consequences and its effect upon his relatives, and they say that, because the will was written in

English and deceased was a German, and was unable, as they say, to understand or write the English language, she could not understand the will. This makes it necessary that we refer perhaps a little more fully to the testimony, but we shall not go into the evidence in detail.

Only Andreson, White and deceased were present at the time the will was drawn, until the witness Jacobson was called in to sign as a witness. We have already referred in a general way to the record as to what was done at the time of the execution of the will. Mr. White testified that, before he went to the home of deceased, before he talked with her, he did not know what was to be put in the will; that he stopped at the bank on the way to her home, and at her home prepared the will; getting the data from her; that he got his information about what was to go into the will from her; that deceased was seated at the table at which he was writing when the will was prepared; that the preparation of the will took about an hour or an hour and a half; that, after it was prepared, deceased said she desired Mr. Jacobson and Mr. White as witnesses; and that Mr. Jacobson was sent for and the will was signed by her and by the witnesses. He says further:

"This will was read over to her after I wrote it, and I discussed it as I wrote it, paragraph by paragraph. She said that was the way she wanted it."

On cross-examination, he says:

"She was up and dressed while I was there; I could observe that she was not well physically, a little thinner than when I had seen her before. She was a German woman; spoke German. She talked English upon the occasions that I met her, except as she talked to Mr. Andreson in German. The language she would use was somewhat broken. I don't think I talked any German with her; I understand the German language some. I don't know particularly what it was that Mr. Andreson explained to her about this will. He talked over in German with her the matters that were put in the will. When he talked with her then he would talk with me some in

English.  Q. And then when he talked with you in English then you knew what to put in the will, did you?  A. No.  We talked English to commence with.  Q. Who talked English?  A. Mrs. Dobals and myself.  Q. Do you mean to say that she talked with you in English and gave to you the terms of this will?  A. Yes, sir, and if you will permit me, I will say that Mr. Andreson talked in German with her and told me what she said in German, that is, he told me in English what he said she said in German.  What Mr. Andreson reported to me as to what she had said while they talked in German was the same as she had told me in English before.  I think I understood Mrs. Dobals and that she understood me.  As I understood it, it was her request, and she wanted to talk it over with Mr. Andreson, and she talked in German part of the time, and part of the time they talked, they talked English.  She told me that she wanted it done as I did it there.''

There is quite an extended cross-examination, but we have given the substance of this testimony.  Andreson was not a witness on the trial.  Mr. Jacobson testified that he came over to her home after the will was drawn, and testifies to the execution of the will.

Contestants sought to show contradictory statements of Mr. White at a time when one of the contestants and his attorney saw him, and the claim is that White then said that Mrs. Dobals and Andreson talked this matter over in German and then Andreson told White in English what she wanted; that he put it down on the paper.  But we think this not materially different from or inconsistent with the testimony of Mr. White, who says that he got the information from her first and that afterwards deceased did talk with Andreson in German about the will, and that Andreson told White then what she had said in German, but that they were both the same; that is, what Andreson told White was the same as what Mrs. Dobals had previously told White in English.  So that, briefly stated, we have in the first place the presumption that testatrix knew what was in the will, which arises from the fact that she

signed it, and then we have the positive and undisputed testimony of the scrivener who drew the will that he got from her in English what she wanted to put in the will.

To meet this, contestants place three or four witnesses upon the stand to testify as to the extent, from their observation and in their opinion, that Mrs. Dobals could speak and understand English. One witness from Omaha says, in substance, that she formerly lived in Schleswig, and that Mrs. Dobals was German and witness was German, and that when deceased and the witness were together they always conversed in German, and that she never heard her try to talk in English. Mrs. Hirsch, who lived in Denison, but who had formerly lived in Schleswig, testified that she, witness, was a German and knew but little about the English language; that deceased told her what she said to the neighbors in English, and that was a few broken words. Mrs. Strock, another lady who formerly lived in Schleswig, testified that she had never heard deceased carry on a conversation in English except with witness, and on cross-examination said that she did not speak German, and that whatever conversation she had with Mrs. Dobals was in English; that they talked to each other; that sometimes Mrs. Dobals would ask her to write letters for her; and that witness got from her what she wanted written. A daughter of deceased, who lives in China, Ida Krzywoszewski, one of the contestants, who testified by deposition, said, in speaking of her mother:

"Her knowledge of English was very limited, and I do not think she would be able to converse properly in that language."

Another daughter testified by deposition:

"During the time that I maintained friendly relations with my mother, she could read or write English some."

In our opinion, this was not enough to take the case to the jury on appellants' theory that deceased did not understand the provisions of the will. As we have stated, there was no evidence of undue influence, and we are of opinion that the

circumstances were not such as to raise any presumption of fraud or undue influence, or to shift the burden of proof. There is no evidence tending to show that Andreson had ever given testatrix any advice as to how she should dispose of her property, or even that he had advised her to make a will. There is no evidence showing a disposition on his part to suggest how she should dispose of her property, and certainly nothing indicating a disposition on his part to dominate her will. It is not even shown that Andreson had an opportunity to exercise undue influence, except that he was present all the time that Mr. White was, at the time of the execution of the will. They went to Mrs. Dobals' home together. There must be some evidence or some basis upon which to base a claim that there was undue influence by Andreson or someone. It it not claimed, of course, and could not be, that Mr. White was guilty of undue influence. As we said in the case of *In re Will of Overpeck,* 144 Iowa 400, 406:

"In the absence of anything connecting Wolf (who was charged with having exercised undue influence) with the formation or execution of the design to make such a will, no court can say, nor leave it to the jury to say, that he unduly influenced such execution."

2.   It is next contended for appellants that the will itself, under the circumstances, was evidence for consideration by the jury on the question of testamentary capacity and undue influence, citing *Trotter v. Trotter,* 117 Iowa

3. WILLS : testa- 417; *Manatt v. Scott,* 106 Iowa 203, 216; and
mentary capac-
ity : evidence : other cases. It is true that the will itself may
unreasonable-
ness of instru- be considered in connection with other evi-
ment.
dence in determining whether it is the product of a sane mind and a free will, but none of the cases cited makes that, by itself, sufficient to take the case to the jury. The only point that could be made as bearing upon the question of testamentary capacity or undue influence would be in the supposed unreasonableness of the provisions of the will. It must be borne in mind always, of course, that the testatrix,

if mentally competent and not unduly influenced, has a right to do with her property just as she pleases, and that it is not the business of a jury to make a will for deceased simply because they might think deceased should have made a different will. A person is, in one sense, making his will every day. He knows the needs and the disposition of this child and that, and the treatment received by the person making the will, and all these circumstances.

Considering all the circumstances, we think there is nothing unreasonable in this will, and a jury ought not to be allowed to so say. The bequests of $500 each to the two ministers and the church and to Andreson are small, in comparison with her whole estate. Mr. Andreson had been acting for her in assisting in transacting her business, and there is no evidence to show that he had ever been paid anything. We do not know exactly, of course, the mental attitude of deceased towards the ministers and the church. There may have been all-sufficient reasons in her own mind for making these bequests. She had no immediate family, in the sense that they were members of her household. Her children were all of age, and the trouble between deceased and her former husband, and the children's taking sides have been referred to. And we have referred to the treatment of deceased by some of the children. Some of the other children were given $500 each, and a large sum was given to a grandchild, but to go to a son of deceased's, the father of the grandchild, under certain conditions. This she had a right to do. The will, taken as a whole, was no evidence from which a jury could rationally find that testatrix lacked testamentary capacity, or that it was the result of undue influence.

We have gone into the record rather fully, perhaps more than justified, and it is our conclusion that the trial court properly directed a verdict for the proponent. It follows, therefore, that the judgment of the district court is—*Affirmed.*

EVANS, C. J., DEEMER and WEAVER, JJ., concur.