In the matter of the last will and testament of ISAAC GLUCKMAN, deceased.

[Argued March 14th, 1917.   Decided June 18th, 1917.]

1. A will properly proved to have been executed with due legal formality by a testator whose testamentary capacity is not questioned is entitled to probate, in the absence of fraud, undue influence, or mistake in the identity of the document executed.

2. Physical or educational disability, however, as blindness or inability to read the language, if accompanied by circumstances leading the court to suspect possible imposition, subjects proponents of a will to the additional burden of showing to the satisfaction of the court that testator knew its contents so that he understood them.

3. This burden is sustained by satisfactory proof that the testator was made acquainted with and understood the contents of the will to the same extent that he would have done if the disability had not existed and he had read the will himself. The extent of the burden is measured by the effect of the disability.

4. In the absence of fraud or of undue influence, a variance between the will and the instructions from which it was drawn will not defeat probate.

5. In the absence of fraud or of undue influence, mistake, except in identity of the instrument executed, will not defeat probate.

6. Misunderstanding of the legal effect of the provisions of a will, whether resulting from erroneous legal advice or otherwise, will not, in the absence of fraud or of undue influence, defeat probate.

On appeal from the prerogative court, whose opinion is reported in *87 N. J. Eq. 280*.

This is an appeal from an order of the prerogative court affirming an order of the Hudson county orphans court deny-

ing probate to a document offered as the last will and testament of Isaac Gluckman, late of the city of Bayonne, deceased. Gluckman left a widow but no descendants. The will in question was drawn and executed two days before his death when he was about to undergo an operation for appendicitis, and it gave his entire estate to his executors to pay his widow, out of the income, "a weekly allowance of $40 and such other sum or sums as may be necessary during the term of her natural life," she to remain in the residence, and after her death .the entire residue of the estate to go to such home for old people as the widow should by will direct, or in default of such direction, as should be selected by the executors. It appointed as executors Mahnken, the president of a bank with which testator did business, Annett, testator's real estate agent, and Judge Roberson, his lawyer who had represented him during a period of twenty-five years, and who drew the will. Testator was unable to read or write (except his own signature) in the English language, but could talk and understand that language, although somewhat brokenly and imperfectly. He was in bed when he gave instructions for drawing the will, and his lawyer testified that the instructions as given were:

"All of the property for Mrs. Gluckman for life. I want Mr. Roberson and Annett and Mahnken to be executors. The debts of the estate are so many that I do not know when she will get any income; allow her forty dollars a week out of the income. Not move from the house until she die."

"Then he said after I had stopped writing: 'I give her as much more as is necessary for her support, and after her death to Home for Old People.'" The lawyer produced a short abbreviated memorandum made by him as these instructions were given. He says he understood or interpreted the part of the instructions after the one for the appointment of executors to be a modification of the first sentence of the instructions; that he went into an adjoining room and at once drew the will in accordance with this interpretation, brought it back and read it paragraph by paragraph to the testator, who fully understood it and nodded assent to each paragraph; that he told testator that the provision of the will which directed the executors to

pay the widow in addition to the $40 weekly allowance, "such other sum or sums as may be necessary during the term of her natural life," would permit the executors to give and allow her the whole income after the debts were paid, and that the testator said, "All right.  That's good."  The will was then executed with complete formality in all respects.  There was evidence that after the execution of the will, and immediately before the operation, testator told his wife and others that he had left everything to his wife.  The estate consisted of about one hundred small houses, estimated to be worth from $200,-000 to $250,000, but subject to $101,000 of mortgages and $9,000 or $10,000 of unpaid back taxes.  There were also outstanding promissory notes of the testator amounting to from $16,000 to $25,000.

There was a former will executed some four years earlier, and which is still in existence, which, if unrevoked, gave $5,-000 each to a brother and to a sister of testator, $1,000 to the widow of a deceased brother, and the remainder of testator's estate to his widow absolutely.  The brother and sister are the caveators, and testator's widow, while not formally a caveator, was represented by counsel who took the chief part in opposing the probate.

*Mr. Elmer W. Demarest, Mr. Lindley M. Garrison* and *Mr. Gilbert, Collins,* for the appellants-proponents.

*Mr. Max Levy* and *Mr. Clarence Linn,* for the caveators-respondents.

*Mr. Joseph M. Noonan,* for the respondent Rosa Gluckman.

The opinion of the court was delivered by

WHITE, J.

The question involved is one of probate under the statute, pure and simple, and not one either of construction or of reformation.

The document offered for probate is of testamentary character; it is in writing; it was signed by the testator; it was both signed by the testator and declared by him to be his last will in the presence of two witnesses who were present at the same time, and who subscribed their names thereto, as witnesses, in the presence of the testator, and at his request. It has not been revoked and the testator is now dead. No question is raised involving lack of testamentary capacity on his part.

A will so executed, under these circumstances, is entitled to probate unless it be the result of fraud or of undue influence or (within certain limitations) of mistake. Fraud (and this involves bad faith on the part of its perpetrator) willfully deceives free agency; undue influence over-masters it; while mistake, whether self-induced or the result of the innocent error of another, misleads free agency, without bad faith or domination on the part of anyone.

Where a testator, in addition to complete testamentary mental capacity, is in full enjoyment of average physical and educational faculties, it would seem that in the absence of fraud or of undue influence, a mistake, in order to defeat probate of his entire will, must in substance or effect really amount to one of identity of the instrument executed; as, for instance, where two sisters, in one case, or a husband and wife, in another, prepared their respective wills for simultaneous execution, and through pure error one executed the other's, and *vice versa*. *Anon. 14 Jur. 402; Re Hunt, L. R. 3 P. & D. 250; Nelson v. McDonald, 61 Hun (N. Y.) 406.*

Short of this, however, or of something amounting, in effect, to the same thing, it is against sound public policy to permit a pure mistake to defeat the duly solemnized and completely competent testamentary act. It is more important that the probate of the wills of dead people be effectively shielded from the attacks of a multitude of fictitious mistakes than that it be purged of wills containing a few real ones. The latter a testator may, by due care, avoid in his lifetime. Against the former he would be helpless.

Where, however, a testator, by reason of physical or educational disability, as by blindness or by inability to read the language in which the will is written (as in the case *sub judice*), is unable by the exercise of his own faculties, to see for himself that the will expresses his testamentary desires, an additional burden is imposed upon the proponents of the will, where there are any circumstances which lead the court to suspect that he may have been imposed upon (*Patton* v. *Hope, 37 N. J. Eq. 522*), namely, that of showing to the satisfaction of the court that such a testator was made acquainted with the provisions of the will so that he understood them. *Day* v. *Day, 3 N. J. Eq. 549; Harris* v. *Vanderveer's Executor, 21 N. J. Eq. 561; Lyons* v. *VanRiper, 26 N. J. Eq. 337; Hildreth* v. *Marshall, 51 N. J. Eq. 241.*

Most frequently where a physical or educational disability of this character exists, contested will cases are founded upon fraud or upon undue influence.

In the present case, however, the learned trial judge of the orphans court of Hudson county before whom the issue was tried, and the learned vice-ordinary who heard it on appeal to the prerogative court, were both of the opinion that neither fraud nor undue influence entered into the making of this will. A careful examination of the evidence leaves us in entire and emphatic accord with this view.

Both of these judges, however, were convinced that, by reason of what they thought was an error on the part of the lawyer who drew the will in misinterpreting the testator's intentions, and also in advising testator of the legal effect of one of its provisions, the will as executed did not, in at least one very important respect, carry out the intention of the testator, and that it was not, in this respect, understood by him when he executed it. For this reason probate was refused. We think this was error.

. While we agree that a situation arose under the evidence (by reason of testator being unable to read the English language, taken in connection with the testimony tending to show a state of mind or intention on his part inconsistent with that indicated by the will as executed) which put the burden upon

proponents of showing to the satisfaction of the court that testator was made acquainted with the provisions of the will so that he understood them, we, nevertheless, think that proponents successfully sustained this burden.

The contrary view of the learned trial judges below seems in reality to have been based upon two uncontrolling elements, namely—*first*, what they thought was a variance between the will as executed and the instructions from which it was prepared, and *second,* what, if it existed, amounted to a pure mistake upon the part of the testator (whether self-induced or resulting from erroneous legal advice of his lawyer) as to the practical effect of a provision of the will which he knew it contained and thoroughly understood.

As to the first of these, it is quite immaterial whether the will did or did not correctly embody the instructions, if in point of fact the testator, when he executed it, was made acquainted with and understood its contents. As was said by Vice-Ordinary Reed, in *In re Livingston's Will, 37 Atl. Rep. 770:* "It is said that her instructions were not followed in drafting the will; * * * and that the will as drafted does not carry into effect that wish. * * * But, whether it does or not, if she was capable of making a will, and there was no fraud practiced upon her by which she was misled into signing what she did not wish to sign (and there is no proof of fraud in this case), it would not matter what variation there might be between the instructions and the executed instrument.

As to the second: Assuming that the lawyer's assurance that the "such-sum-or-sums-as-may-be-necessary" clause would permit the executors to pay over the entire income after the debts were satisfied, was intended and understood as legal advice upon the construction of this clause, and that it was legally unsound (which, under the circumstances, we think it was not), that, also, in the absence of fraud or of undue influence, is insufficient to defeat probate of the will. It is no new thing for provisions in wills to turn out, under the established rulings of the courts, to have a very different meaning from that which the testators themselves, under the honest but mistaken advice of counsel, thought they had when the wills were

executed, but this has never been a ground for refusing . probate.    The learned vice-ordinary recognized this rule, citing *Collins* v. *Elstone* (*1893*), *L. R. Prob. Div. 1*, but thought the situation was different where the testator could not read nor write.    We think the difference is limited by the effect of the disability which gives rise to it.    If a blind testator makes a will, and through pure mistake a clause which he intended, and gave instructions, to insert, is left out, the will is entitled to probate if the testator was made acquainted with and understood what it did contain, in spite of the fact that he intended to insert another clause which by inadvertence was omitted. A tinge of fraud or of undue influence might shed an entirely different light, but in the absence of either of these, the error becomes a mistake, pure and simple, not resulting from, and therefore not protected by, any failure to conform to any rules devised to overcome the disadvantage of the disability.

So, in this case, the testator was made acquainted with and understood the fact that the will which he was about to execute provided that his wife should get, during her lifetime, from the executors, out of the income, $40·per week and such additional sums as should be necessary.    Knowing and understanding that, he knew and understood exactly what he would have known and understood, if he could have read the English language with average intelligence and understanding and had read this will himself instead of its being read to him.    We think, therefore, that the honest legal advice (if it was legal advice) given him as to what the executors could legally do under the clause in question, can, even if legally unsound, have no more effect in preventing probate of the will in the one case than in the other, which is none at all.

This brings us to the one material question in the case, which is:.  Did the testator when he executed this will know and understand its provisions to the same extent that he would have done had he been able to read and understand written English with average facility and comprehension, and had he read the will himself instead of having it read to him?    We think this question must be answered in the affirmative.    He was a keen business man, in full possession of his faculties, and

thoroughly intelligent (as is evidenced by his being "well versed in Hebrew lore"), able and accustomed perfectly to understand and be understood by Judge Roberson, who had been his close and constant legal and business counsel while testator pursued the road from penury to comparative affluence, during a period of twenty-five years, and the will was read to him and expressly assented to by him paragraph by paragraph. The clause in question is of such a nature that to hear it read would necessarily convey the knowledge of what it said. It said the executors were to pay the widow out of income such sums in addition to the $40 per week as should be necessary during her life, with a remainder over after her death to a home for old people, to be selected in the manner directed. Obviously, upon hearing this clause read by his lawyer, testator knew and understood exactly what he would have known and understood if he could have read English with perfect facility and had read it himself. That this is so is also evidenced by the fact that when the lawyer told him this clause would permit the executors to pay all the income to the widow when the debts were paid, he said, "All right. That's good."

We think, therefore, that proponents have sustained the burden of showing that testator knew and understood the contents of the will when he executed it, and that it should be admitted to probate.

We may say in this connection also that we are not at all certain that there was any mistake whatsoever made by anybody in the preparation of this will or in what was said as to the practical effect of the provision in question. When the testator's personality was withdrawn by death, it left this heavily-involved estate in a most precarious condition, and no one understood better than the testator when he made his will that this would be so. He knew that his estate, consisting, as it did, exclusively of one hundred small houses worth maybe $200,000, but subject to over $100,000 of mortgages and also to shrinkage in rental and market value from deterioration and obsession, not to mention the cost of constant repairs and renewals, with $10,000 of unpaid taxes in arrear, and upwards of $25,000 of floating debt, was a leaky ship in a stormy sea,

and that if his wife was to get any real benefit from it at all, there must be skillful handling. He provided for such handling by securing the services, as executors, of the three men who had assisted him most in the very lines where strength would be needed, namely, his banker, his real estate man and his lifelong lawyer. If they were to succeed they would need leeway, discretion, full control. Also, it is quite likely that the practical effect of the clause in question may turn out to be to permit the payment of all the income to the widow after the debts are paid, just as the lawyer said it would. It does not seem probable that the net income will amount to more than will be necessary for the widow to live upon in the manner her husband would have desired, and her age and the assistance she rendered him entitle her to enjoy as soon as the dangers which threaten the entire estate are safely passed. This testator may well have thought he was adopting the very best way possible under the circumstances of securing to his wife the entire income for her life. That may have been what he thought when he told her and others that he had left everything to her. Certainly, he did not mean that assurance literally, as the provision over after her death to a home for old people, which he included in his instructions and discussed and approved the details of as fixed by the will thoroughly demonstrates.

But be this as it may, we are quite satisfied that for the other reasons herein stated the will should receive probate and the order of the prerogative court affirming the order of the orphans court denying probate is, therefore, hereby reversed and the matter remanded to the prerogative court in order that an order may be duly made admitting the will to probate. The costs will be paid out of the *corpus* of the estate.

*For affirmance*—None.

*For reversal*—GARRISON, SWAYZE, TRENCHARD, BERGEN, MINTURN, KALISCH, BLACK, WHITE, HEPPENHEIMER, WILLIAMS, GARDNER—11.