IN RE ESTATE OF EMMA C. YOUNGGREN.

No. 44745.

JUNE 20, 1939.

W. C. Ratcliff, R. J. Swanson, and Levi H. Mattox, for proponents, appellants.

L. L. Orsborn and Stephens, Thornell & Millhone, for contestants, appellees.

HAMILTON, J.—Emma C. Younggren, testatrix, was born in Sweden. She came to this country when she was twenty-two years of age and, with her husband, Gus Younggren, settled on a farm in Page county, Iowa, where she lived for 63 years. She departed this life May 1, 1936, at the age of 91 years. Her husband preceded her in death having died intestate in 1905, owning, at the time of his death, 960 acres of Iowa land and 160 acres of land in Hand county, South Dakota. Besides his wife, Emma, he left surviving him as his children and only heirs at law a daughter, Ellen, and three sons, Emil, Charley and Luther. Charley married and left home in 1898. The other three children never married and resided at home with their parents. Charley died in March, 1932, leaving his wife and four children. These four children are the contestants.

The 960 acres of land, 800 acres of which were located in Page county, Iowa, and 160 acres of which were located in Montgomery county, Iowa, were voluntarily partitioned among the testatrix, as surviving spouse, and the four children. Mrs. Younggren was allotted 320 acres and the four children, Emil, Charley, Luther and Ellen, each received 160 acres. The South Dakota land has never been partitioned. Emil died intestate in 1922 leaving his mother as his only heir at law. At the time of his death, Emil owned 240 acres of land, 160 acres of which being the land inherited from his father, and this 240 acres passed to the mother by inheritance. The son Luther apparently had financial reverses and was compelled to mortgage the 160 acres inherited from his father and another 80 which he had subsequently purchased. The mortgage was foreclosed and the mother, testatrix, purchased this 240 acres at sheriff's sale. Subsequent to her husband's death, testatrix also purchased two other farms, one of 200 acres and the other of 240 acres, so that, at the time of her death, she owned, free of encumbrance except current taxes, 1,240 acres of Iowa land appraised at $109,000, also personal property of the appraised value of $28,354.70 besides her undivided interest in the South Dakota 160-acre tract and she "owed not any man". By the terms of her will Luther received 740 acres valued at $72,400; Ellen received 300 acres valued at $19,000 and the four grandchildren, contestants, received jointly 200 acres valued at $9,000. The personal property, after payment of debts, funeral expenses and costs of administration, was divided equally,—contestants re-

ceiving one third and Luther and Ellen each one third. It will thus be seen that Luther got the "lion's share" of the mother's estate.

The objections to the probation of the will alleged undue influence on the part of Luther, mental incompetency and that testatrix did not understand the contents of the will. The first two grounds, undue influence and mental incompetency, on motion of proponents, were withdrawn from the jury and the only issue submitted to the jury was whether or not testatrix, at the time of the execution of the purported will, understood the contents thereof. It was the contention of the contestants that testatrix did not understand the English language and that the will was prepared in the English language and read over to her in English and the contents thereof were never explained to her in her native tongue, the Swedish language. The court instructed the jury that, under the evidence, the said purported will was properly signed by testatrix and it was properly witnessed by two witnesses, as required by the law of the State of Iowa, and that this created a presumption that, at the time of the execution of the instrument, testatrix understood the contents thereof and the said will would be admitted to probate unless the contestants showed by a preponderance of the evidence that at said time the testatrix did not understand the contents thereof. The correctness of this statement of the law is not disputed. Proponents do contend, however, that since the issues of undue influence and mental incompetency were withdrawn from the jury, from which no appeal was taken, the presumption that testatrix understood the contents of the will when executed became a conclusive one and left nothing to be submitted to the jury. The case was twice tried in the court below. Both times the jury returned a verdict for the contestants. If, therefore, there was evidence reasonably sufficient to warrant the court in submitting this question to the jury it would seem that we should be loathe to set the verdict aside.

Under the record submitted, the question is not of easy solution and is not entirely free from doubt in the mind of the writer of this opinion but, when all the facts and circumstances are carefully considered, the court is persuaded that the trial court was right in submitting the matter to the jury.

The will was prepared by George A. Anderson, an attorney of Clarinda, Iowa, an old-time acquaintance and friend of the

Younggren family, who spoke the Swedish language fluently. The mystery in the plot arises from the fact that the will was typed by attorney Anderson who, at the time of the trial, was deceased. The evidence is entirely circumstantial as to when or from whom Anderson obtained the information from which he prepared the will. Mrs. Anderson, wife of the scrivener, worked in her husband's office but her testimony throws no light on this question except that she did testify that Luther, between the 1st of April and July 6, 1932, was in her husband's office several times. The will was executed July 6, 1932, which was on Wednesday, and the daughter Ellen testified that, on the preceding Sunday, Mr. Anderson with his wife was at the Younggren home and Mr. Anderson talked with her mother at that time. This is flatly denied by Mrs. Anderson. She testi-fied that she was not at the Younggren home on this particular Sunday; however, she was unable to state where they were on that Sunday. There is, also, the circumstance of the probability of the will having been prepared from information received from someone who was able to point out the various farms so as to enable the scrivener to obtain the legal description; for the will contains a legal description of the land devised to Luther and Ellen which is followed by a paragraph devising and bequeathing the remainder, in equal shares, to Luther, Ellen and the grandchildren and we think it is fairly apparent that, while Mrs. Younggren, the testatrix, was probably able to make reference to the farms by their names,—as the record shows that each of the farms was referred to by a certain name—, she would not be able to furnish the scrivener with the particular legal congressional description of the several tracts of land. The will was prepared in the English language and attorney Anderson, together with his wife, went to the home of testatrix and the evidence is that, at that time, the will was read over to Mrs. Younggren in English and, again, there is a direct conflict as to whether Anderson discussed the will with the testatrix in her native tongue. Mrs. Anderson, one of the subscribing witnesses, said this was not done insofar as she heard and that she was there at the time. On the other hand, Ellen, who was there in the home at the time, testified that she heard attorney Anderson discussing the terms of the will with her mother in the Swedish language. Mrs.Anderson, although a subscribing witness, we think, seemed a rather willing witness

for the contestants. She admitted that her husband spoke nothing but the Swedish language to Mrs. Younggren in all his conversations with her that day but says he did not talk to her concerning the terms of the will. This is a little strange since that was the particular business in hand. The impression one gets from her testimony is that her husband, who would very likely know whether or not Mrs. Younggren was able to comprehend and understand the contents of the will when it was read to her in English, simply read this will over to this old lady, his client and old-time friend, in a language strange to her without any explanation or discussion of the terms of the will. Of course, all this class of testimony must be weighed in the light of the fact that the trial took place in the fall of 1938, six years after the day on which the will was executed, and that the witnesses were merely giving their recollection and the human memory is so unreliable that too much weight cannot be given thereto. About a dozen witnesses for the contestants, most of them old acquaintances, several of them close neighbors and long-time intimate friends of testatrix, after showing their opportunity for observation, testified that, during all the years they had known her, they never heard anyone converse with her in any other than the Swedish language and never heard her converse with anyone in any other than the Swedish language. Three of these witnesses testified to having heard testatrix state that she did not understand the English language. She attended a church where the services were conducted in the Swedish language and in her home among the members of the family they spoke the Swedish language. The pastor of the church was a little more reasonable. The way he put the matter was that "she preferred" her native tongue and he always talked and visited with her in Swedish. On the other hand, a number of disinterested witnesses, one of them her banker, testified that they had talked to her on numerous occasions and that, while here English was broken, she did talk English so that they could understand her and that her answers to questions which they asked her in English indicated that she understood what they said. There is also the circumstance of the absence of any declaration by the testatrix, insofar as the testimony shows, at the time the will was read over to her, that the will, as read, was her last will and testament or was the way she wanted it. The evidence is that it was read over to her in English; that

she could not write and it was difficult for her to see where to place her mark and that attorney Anderson held or steadied her hand while she made her mark with the pen. The making of the mark was witnessed by the two subscribing witnesses to the will. Apparently, the will was left with Mrs. Younggren and its whereabouts is not otherwise accounted for until it was produced and offered for probate after her death.

The only explanation for the inequality in the mother's gift to her children and grandchildren comes from three witnesses who testified, in substance, that testatrix told them she had willed Ellen and Luther more than the rest because they had been home and taken care of her and were entitled to it. These conversations took place several months after the will was executed. Of course, the will itself also contains some explanatory language. In Item II, being the item devising the home place to Luther and Ellen jointly, we find this statement:

"I give the real estate to my two beloved children because it has been my home for many years and the home of my said beloved children, and they have been good and kind to me and cared for me and stayed with me for these many years and I give them this real estate so as to in a measure repay them for their many acts of kindness to me."

And, in Item III, containing the devise to Luther, we find this statement:

"I give the real estate described in this paragraph to my said beloved son for the reason that he has for many years taken entire charge of my business, and I consider that any property that I have accumulated during the past twenty-five years has been due, to a large extent, to the manner in which he has cared for my business, and I give said real estate to him to in a measure recompense him for his faithfulness."

A real close observer might be prone to comment on this explanation in the will as to Luther. It does not exactly square with the fact that Luther was unable to keep what he inherited from his father.

Two Iowa cases most strongly relied upon by appellants are Ross v. Ross, 140 Iowa 51, 117 N. W. 1105, and In re Estate of Dobals, 176 Iowa 479, 157 N. W. 169. We quote from the

former case the following [140 Iowa at page 59, 117 N. W. at page 1108]:

"If the will was executed according to the formalities required by law, the presumption in the first instance is that it was read to testator, or that he was otherwise acquainted with its provisions. [In this case the testator's eyesight was impaired.] The testimony shows beyond all question that the instrument was signed by the testator in person, and it bears upon its face evidence of proper attestation. This matter is fully covered in 1 Underhill on Wills, sections 18-141. See, also. In re Smith's Will (Sur.), 24 N. Y. Supp. 928; In re Crumb's Will (Sur.), [6 Dem. 478] 2 N. Y. Supp. 744. Underhill says: 'It is a fair presumption, recognized by the law, that if a man of intelligence executes with due formalities an instrument of so solemn a nature as a will, he knows its contents. This presumption is strengthened, and in the absence of rebutting facts rendered conclusive, by evidence that the language of the paper which is offered as his will agrees, in substance, with the instructions given by the testator.' In the Smith case, supra, the court said: 'It is not to be presumed that a man of prudence and care affixed his mark to an instrument, and made a declaration as to what that instrument was, without knowledge of its contents. If any presumption is to be indulged, it is that he knew the contents of the paper. All the requirements of the statute as to the execution of the instrument were fully complied with, and this court cannot add another that, because of his lack of education, it must be made to appear that the instrument was read to him.' "

We quote further from this same case as follows:

"The only burden resting on proponents in the first instance was to show the due execution and attestation of the will. Mallow v. Walker, 115 Iowa 238, 88 N. W. 452, 91 Am. St. Rep. 158; Marshall v. Hanby, 115 Iowa 318, 88 N. W. 801; Fothergill v. Fothergill, 129 Iowa 93, 105 N. W. 377; Parker v. Lambertz, 128 Iowa 496, 104 N. W. 452."

In this Ross case, supra, there was evidence showing that testator knew and fully appreciated all the terms of the will. There is no such testimony in the instant case. In the Dobals case, supra, the evidence given by the scrivener who prepared

the will emphatically showed that the will was read over to testatrix after it was written and was discussed as it was being written paragraph by paragraph and that testatrix said that it was the way she wanted it. Appellant also quotes at length from the case In re Will of Bakke, 160 Minn. 56, 199 N. W. 438, 37 A. L. R. 597. In that case, the testatrix was blind; however, in the annotation to this case in the A. L. R. it is indicated that the holding of the Minnesota court in the case of a blind testator was contrary to the general rule.

We think the rule applicable to the situation presented by the facts disclosed by the evidence in the instant case is found in the following statement from 28 R. C. L., section 105, at page 151, as follows:

" * * * whenever a testator, by reason of physical or educational disability, as by blindness or by inability to read the language in which the will is written, is unable by the exercise of his own faculties to see for himself that the will expresses his testamentary desires, an additional burden of proving that the testator was acquainted with the provisions of the will is imposed upon the proponents of the will *if there are any circumstances which lead the court to suspect that he may have been imposed upon.*" (Italics ours.)

This text is supported by the following well considered case: In re Gluckman's Will, 87 N. J. Eq. 638, 101 A. 295, L. R. A. 1918D, 742. Another case having some similarity of facts is In re Beck's Estate, 79 Wash. 331, 140 P. 340.

We are of the opinion that there were sufficient suspicious circumstances of such a character as to form the basis of legitimate inferences to raise a dispute requiring the question to be submitted to the jury as to whether or not the testatrix did, in fact, know and approve of the contents of this will. In other words, there was sufficient conflict in the evidence as to whether or not testatrix had sufficient understanding of the English language that, when this will was read over to her in English, unexplained, she understood fully its contents. The will itself states, that the son Luther "has for many years taken entire charge of my business". This same son had been in the office of the attorney who drew the will several times just prior to its execution. He received over two thirds of the estate, more than eight times as much as the children of his deceased brother

Charley. His presence in the attorney's office, in view of the statement in the will that he had entire charge of his mother's business, furnishes the only clue that has any substantial basis in the evidence as to the source of the information obtained by attorney Anderson in preparing this will. At the first trial Luther did not take the witness stand. The attorney who drew the will was dead and Luther, of all persons, undoubtedly, knew more about the facts surrounding the execution of the will than any other living person. His silence, under the circumstances, was ominous. When the second trial took place, Luther was also deceased. He would, of course, be incompetent as to any personal transactions with his mother but good faith on his part would seem to demand that he at least take the witness stand and make some effort to give the court the benefit of any facts of which he had knowledge in so far as he was a competent witness to do so. Two trial courts heard and saw the witnesses. Much depends on the credibility of these witnesses. We are of the opinion that the care and vigilance exercised by the lower court should have our approval. Other matters presented by appellants have been considered and found to be without substantial merit.

The case is, therefore, accordingly affirmed.—Affirmed.

MITCHELL, C. J., and MILLER, OLIVER, SAGER, and HALE, JJ., concur.