In the year 1894, Thomas Rogers adopted Bertha Helms. John Helms is the son of Bertha Helms. John was afflicted *Page 783 
with infantile paralysis at an early age which left him deformed and he is somewhat subnormal. Thomas Rogers, Bertha Helms and John lived together from 1915 until the death of Mrs. Helms in 1935. Mr. Rogers and John continued to live together on the farm purchased by Mr. Rogers for the benefit of John until the death of Mr. Rogers in 1937. There was a strong bond of affection between Mr. Rogers and his grandson, John Helms. The reader is here referred to Sinco v. Kirkwood, 228 Iowa 1020, 291 N.W. 873, in which case Hale, J., accurately sets out the relationship between all the interested parties and the facts and circumstances forming the background to the execution of the will of Thomas Rogers. On November 21, 1935, Thomas Rogers executed as parts of the same transaction a deed and will, each instrument conveying all of the property of the testator to his niece, Jennie E. Kirkwood, and her husband, Clarence Kirkwood. The main asset of the estate is a farm of 155 acres in Decatur county. A witness for proponents testified the testator stated a lawyer told him that a deed was better than a will "but I want both."
The material part of the will reads:
"Second: Having full and complete confidence that my niece, Jennie E. Kirkwood, and her husband, Clarence Kirkwood, of Des Moines, Iowa, will amply provide and care for my grandson, John Douglas Helms, I leave all the residue and remainder of my property of whatsoever nature or description to the said Jennie E. Kirkwood, and her husband, Clarence Kirkwood, or to the survivor of either."
Mr. Rogers died in May 1937. In February 1938, Roscoe Sinco, guardian of John Helms, filed a will contest on the ground it was procured by the beneficiaries through fraud and undue influence. A verdict was returned for contestant. The case was reversed on appeal. In re Estate of Rogers, 226 Iowa 183, 283 N.W. 906. A second trial of the will contest was had and again a verdict for contestant was returned. It is proponents' appeal from the verdict rendered in the second trial that is before us for determination. In March 1938 the guardian brought a suit against grantees in the deed, Jennie E. Kirkwood and her husband, Clarence Kirkwood, to cancel the deed on the *Page 784 
ground of fraud and undue influence. A degree was entered for plaintiff and the case was affirmed on appeal to this court. Sinco v. Kirkwood, 228 Iowa 1020, 291 N.W. 873.
[1] I. Proponents' first proposition is that there was not sufficient evidence to take the case to the jury on the question of undue influence. With this proposition we do not agree.
It is conceded that the eyesight of Mr. Rogers was impaired to a degree that he was unable to read the will or deed; that his hearing was seriously affected, and, as stated in Sinco v. Kirkwood, supra [228 Iowa 1020, 1028, 291 N.W. 873, 877], was "by reason of his infirmities, shut off from more than a limited intercourse with the world, ill, discouraged and depressed by the recent death of an adopted daughter whom he loved as his own, and who, in his condition, was without anyone to whom he felt he could turn except that daughter's sister, [Mrs. Kirkwood] with whom his relations had always been those of friendly affection and close confidence."
Physicians advised Mr. Rogers that farm life would be very beneficial to John and pursuant to this advice he purchased the 155 acres in Decatur county in 1931 and he, Mrs. Helms and John moved to the farm the same year. John's physical condition improved rapidly and with increased physical strength came an improved mental condition. Mr. Roger's solicitude for the future of his unfortunate grandson is very apparent. He knew that John's physical and mental infirmities hopelessly prevented him from making his own way in life. He knew John liked farm work, was happy on the farm, that his welfare required outdoor life and that the farm would furnish a haven and security for this afflicted young man. That Mr. Rogers purchased the farm for John's benefit cannot be doubted.
The only natural disposition of testator's property would, under this record, be to his heir, John Helms.
Evidence of contestant contains the following statements made by Mr. Rogers:
"Everything will be John's after I am gone.
"After I am through with it, John is to have it.
"The farm will take care of John when I am gone. *Page 785 
"I bought the farm for John's health and for him to live there."
Mr. Rogers said the day John's mother died that the place was John's.
After the instruments were executed, a witness to the will testified the testator said:
"I am glad it is over with. I am an old man and am liable to pass away any time. Now I know John will be taken care of."
We will refer to some of the testimony introduced by proponents. Mildred Rosenburger, a niece of Mr. Kirkwood, testified that the Sunday following the death of Mrs. Helms she and Mr. and Mrs. Kirkwood went to Mr. Roger's home on the farm. She testified to the following conversation between Thomas Rogers and Mrs. Kirkwood with reference to what Rogers wanted done:
"Well, we were all sitting around the table and he said, `I wish you had brought someone with you.' He said, `I want to get this matter straightened up and done right so it will stay.' He said someone that was a lawyer, I think, at Stuart, had told him that — well, he said first that he wanted both a deed and will. He said, `I want both', and then he spoke the man's name as far as I can remember, and he said, `The lawyer told me that a deed was better than a will and I want both', he said. And they talked about it back and forth and the question was raised by Mrs. Kirkwood if John's name should be put in there and Uncle Tom said, `No', he said, `He will cause you trouble with every dollar.'
"That seemed to be the main idea in his mind that he talked with Mrs. Kirkwood about. While he was talking to Mrs. Kirkwood I remember her reaching across the table and taking an envelope and jotting down things as Mr. Rogers spoke about them."
The witness then testified that "he wanted Ardith Harrison's (daughter of Mr. and Mrs. Kirkwood) name in there and he gave the reason at the time he wanted it to stand always and if something would happen to Mrs. or Mr. Kirkwood they would still get it. He said no one else had ever paid any doctor bills *Page 786 
or done as much for them as they had and that was the reason he wanted it to be that way. He said they had more in it than anyone."
It should be stated that neither Mr. Kirkwood nor Mrs. Kirkwood paid any part of the purchase price of the farm. The record shows Mr. Rogers paid for the farm and that it was free from encumbrance.
It will be noticed the witness did not testify the testator did not want John Helms to have an interest in his estate. Nor did she state the testator said he wanted to leave all of his property to the Kirkwoods because "he had full and complete confidence" that they would amply provide for his grandson. In the latter part of her testimony the witness states — rather vaguely — that the Kirkwoods were to have the property absolutely. According to this witness the testator did not even want to fasten on the conscience of the Kirkwoods the moral duty to look after and care for the afflicted boy.
Mr. and Mrs. Kirkwood lived in Des Moines. Mr. Deskin, the Des Moines attorney who drew the will and deed, had previously represented the Kirkwoods as their attorney. He testified that he drew the instruments from information he received from Mrs. Kirkwood. A few days later he took the will and deed to the home of Mr. Rogers. He states that he, Mrs. Deskin, Mr. and Mrs. Kirkwood, John Helms and Mr. Rogers were present when he read the will to Mr. Rogers. He further testified:
"I read the first paragraph that pertains to the payment of his expenses. In response to it `Sure, I want my debts paid.'
"Then I read the second paragraph, I read it loudly and repeated it at times. It pertains to leaving of the remainder of his property after the payment of his debts to Mrs. and Mr. Kirkwood."
"Q. What did he say when you read that? A. He said the Kirkwoods had been good to him and that was the way he wanted it.
"Then I preceded to read the next paragraph that pertained to the appointment of the executives. *Page 787 
"Q. And when you read that to him what, if any, comment did he make? A. He said he was leaving everything to the two Kirkwoods, and they would handle it.
"The second time I read it straight through so that there would be any comments to be added."
John Helms testified the will was not read to the testator the night it was executed. We should state, that while the record shows that John is subnormal, his testimony in the case is clear, definite and intelligent. It is not claimed Mr. Rogers told Mrs. Kirkwood to employ Mr. Deskin or that he gave Mr. Deskin any instructions as to how he wanted to dispose of any of his property.
A witness to the will testified that it was not read to Mr. Rogers while he was there. As stated, John Helms denies the will and deed were read to Mr. Rogers at any time. Mr. Deskin testified he did not know Rogers prior to the night the instruments were executed and that he did not tell the testator that the will did not devise John Helms any interest in the property. Mr. Rogers told proponents' witness Mildred Rosenburger he wanted the Kirkwoods to bring home a lawyer so he could get "this matter straightened up and done right so it will stay." In noncompliance with this request, the Kirkwoods went to their lawyer, dictated the terms of the instruments which were brought to this sick man, whose eyesight and hearing were defective, all prepared for his signature. The instruments were brought to him by Mrs. Kirkwood, sister of his adopted daughter, and her husband in whom he imposed confidence and trust.
We quote from 28 R.C.L., section 105, page 151:
"And it may be added that whenever a testator, by reason of physical or educational disability, as by blindness or by inability to read the language in which the will is written, is unable by the exercise of his own faculties to see for himself that the will expresses his testamentary desires, an additional burden of proving that the testator was acquainted with the provisions of the will is imposed upon the proponents of the will if there are any circumstances which lead the court to suspect that he may have been imposed upon." In re Estate of Younggren, *Page 788 
 226 Iowa 1377, 286 N.W. 467; In re Gluckman's Will, 87 N.J. Eq. 638, 101 A. 295, L.R.A. 1918D, 742. The following statement of Hamilton, J., in In re Estate of Younggren, 226 Iowa 1377, 286 N.W. 467, 470, l.c. 1384 of 226 Iowa, is applicable to this case:
"We are of the opinion that there were sufficient suspicious circumstances of such a character as to form the basis of legitimate inferences to raise a dispute requiring the question to be submitted to the jury as to whether or not the testatrix did, in fact, know and approve of the contents of this will."
John Helms, the beloved grandson and heir of testator, the natural object of his bounty, received nothing under the will. We are of the opinion that under all the facts and circumstances there is a sufficient conflict in the evidence on the question of undue influence, on the question whether testator knew the contents of the will, to take the case to the jury.
[2] II. Proponents claim it was error to admit the declarations made by the testator which are set out in division No. 1 of this opinion.
We have held there must be evidence, independent of declarations of the testator, of undue influence before such declarations may be considered. In re Estate of Johnson, 222 Iowa 787, 269 N.W. 792; Zinkula v. Zinkula, 171 Iowa 287, 154 N.W. 158; Johnson v. Johnson, 134 Iowa 33, 111 N.W. 430; Muir, Administrator, v. Miller, 72 Iowa 585, 34 N.W. 429.
In Johnson v. Johnson, supra, the court states on page 34 of 134 Iowa, page 431 of 111 N.W.:
"If the provisions of a will are such as a person in a like situation and similar relationship would not ordinarily make, then this may be considered by the jury in connection with evidence that undue influence has been exerted, as tending to corroborate or confirm the claim that the will is the result of such influence rather than the voluntary act of the testator. This is on the theory that the instrument is such as would be likely to be so produced. But in the absence of any evidence that the testator may have been induced to insert the odious provisions or execute the will by coercion, imposition or fraud, the mere fact that the terms of the instrument are unequal is without probative force." *Page 789 
After holding that the fact of undue influence must be independently established before declarations of the testator are admissible, the court states on page 37 of 134 Iowa, page 432 of 111 N.W.:
"Undoubtedly the statement of the deceased may be received as indicating his state of affections or dislike for particular persons benefited or not benefited by the will, of his inclination to obey or resist persons alleged to have exerted the influence, and, in general, his mental or emotional condition with reference to his being affected or influenced by any of the persons concerned."
In this case there is independent evidence of undue influence and the foundation was thus laid for declarations of the testator showing his state of mind and feelings toward his grandson and for permitting consideration of the fact that John Helms was the natural recipient of Mr. Roger's bounty and received nothing under the will as bearing on the question of undue influence.
III. Proponents assert the court erred in admitting evidence of the commitment of John Helms by Mrs. Kirkwood to the institution for the care of epileptics and feeble-minded persons at Woodward, Iowa, and the resulting habeas corpus proceedings. This evidence was admissible for the reason stated in Sinco v. Kirkwood,228 Iowa 1020, 291 N.W. 873.
IV. Proponents' next proposition is an omnibus assignment of alleged errors of the trial court in admitting evidence offered by contestant over proponents' objections. This assignment fails to comply with Rule 30. We have carefully considered this assignment, however, and are satisfied that there should not be a reversal on the grounds urged.
[3] V. One of the defenses pleaded by proponents is that "in consideration for the making of the said will willing to them all property belonging to the said Thomas Rogers, except sufficient to pay his obligation, it was verbally agreed between Thomas Rogers, and these respondents, that they should care for and look after John Helms after his demise and in conformity with said verbal agreement these respondents did take charge of, and did look after the said John Helms." Proponents *Page 790 
claim the court erred in sustaining the motion of contestant made at the close of the evidence to withdraw this issue from the jury. Proponents did not introduce any evidence of an oral contract. They now claim that the contract was created through the statement in the will that testator "having full and complete confidence that my niece, Jennie Kirkwood, and her husband, Clarence Kirkwood, of Des Moines will amply provide and care for my grandson, John Douglas Helms, I leave all my property", etc., and the fact, according to proponents' testimony, that the will and deed were delivered to and accepted by Mrs. Kirkwood about two weeks after their execution. Proponents state that "a contract may be implied from silence where one to whom a proposition respecting a contract to will his property is made keeps silent, knowing that his silence will be deemed consent." The statement in the will did not amount to an offer and obviously this evidence did not establish the alleged contract. Furthermore, the alleged contract rests in part on the terms of the will and the same undue influence that would vitiate the will would vitiate the contract.
Finding no reversible error, the case is affirmed. — Affirmed.
RICHARDS, C.J., and SAGER, HALE, MILLER, HAMILTON, MITCHELL, BLISS, and OLIVER, JJ., concur.