IN RE ESTATE OF J. W. HADLEY.
C. R. HADLEY, contestant-appellant, v. L. E. HADLEY et al., proponents-appellees.

No. 47724.

(Reported in 45 N.W.2d 140)

DECEMBER 12, 1950.

Hall & Ewalt, of Indianola, for appellant.

J. W. Kridelbaugh and Oscar Stafford, both of Chariton, for appellees.

BLISS, J.—The will offered for probate was executed by the testator on July 26, 1935, when he was eighty-three years old. He died in March 1948 at the age of ninety-six years. He had been living in Chariton for about eighteen months just preceding his death, but had spent his prior adult life as a farmer and cattle raiser and feeder in Warren County, Iowa. His wife died December 4, 1934. On the death of her husband in 1922, his daughter, Alice Cochran, one of the proponents, with her two little girls, under five years old, returned to her parental home to live. After her mother's death she lived with her father as his housekeeper until his death. She not only did the housework and performed some farm chores, but also sometimes wrote checks for both her father and mother and sometimes made bank deposits for him. There is no evidence of mental incompetency or testamentary incapacity with respect to the deceased at any time, and contestant makes no such contention.

The testator's family, after his wife's death, consisted of seven children, namely, L. E. Hadley, Alice Cochran, O. E. Hadley (now deceased), Ruby Needles, Ben Hadley, who was

deceased when the will was executed and whose children, Naomi and Neal Hadley, are legatees under the will, M. W. Hadley, and Charles R. Hadley, the contestant.

The contestant, seventy-two years old, had never prospered. For many years his financial obligations exceeded his assets. He realized that if his father died intestate his distributive share in the estate might be subjected to the payment of his debts. With this thought in mind, he and his brother M. W. Hadley solicited their father, in 1934, to make a will. He did so at that time and bequeathed his property equally among his children, except that the one-seventh share of Charles R. was given by the will to the wife of Charles. The will was left in the possession of Charles.

The contestant made Alice Cochran his witness and asked if she and her father had not called at the home of Charles for the first will and received it. She said that this was true. In cross-examination and in redirect examination she testified that her father told her he was going to get the will, and she then telephoned to Charles to ascertain whether he was home, and told him that she and her father were going to call upon him; that Charles then said he would come after them, and he did so; that her purpose in going was to again demand of Charles some payment on his debt to her; that after she had made the demand, her father then asked Charles for the will, and the latter delivered it to his father, and on their return home her father said: "There is no use keeping that. I don't want that," and then destroyed the will.

According to the testimony of W. M. Wilson, a lawyer in the practice at Indianola since 1903, the testator, whom he had known quite well for thirty-five years and who had been a client of his, came into the reception room of his office accompanied by a son and two ladies. His recollection was that the son was O. E. Hadley and the ladies were Mrs. Needles, a daughter, and Mrs. Grace Hadley, a daughter-in-law, of the testator. When it was suggested to the witness that one of the ladies might have been Alice Cochran he said that was not his recollection, but he might be mistaken as it was a long time ago. Mr. Wilson testified that after J. W. Hadley told him he wished to have his will drawn he and Mr. Hadley and the son went into the private office, and

it was his recollection that the ladies did not come in; that it took at least a half hour to get the data for preparing the will, and he then dictated the will to his stenographer in the presence of J. W. Hadley and the Hadley son and no one else; that after the will was typed he read it to J. W. Hadley with no one present, and then Mr. Hadley signed the will, and he (Mr. Wilson) and his stenographer (deceased at time of trial) signed the will as witnesses.

Being asked if anyone else other than Mr. Hadley told him what was to go into the will Mr. Wilson testified:

"I don't think so. I don't believe there was. * * * I don't believe any other member of that family at that time told me what should go into the will. I don't think I had any conversation with other members of Mr. Hadley's family concerning what should go into the will. I don't think I had. * * * about the only thing I can recall is who would act as executor. That was before the will was made."

The following was in re-cross-examination of Mr. Wilson:

"Q. In the will there is a good deal of detail with reference to a note and interest rates and so on. Were there some papers produced at that time to refer to? A. Well, I presume there must have been. I don't have any independent recollection of whether the papers were before me other than that they were furnished by Mr. Hadley. * * * I think Mr. Hadley furnished me the information that I used in dictating the will. I don't know whether he had it in mind or whether he had the notes there, or anything about that. Q. Do you know whether or not Mr. O. E. Hadley was there with some data? A. Well, it could be possible he had it. I don't know. Those two sat together at the table right opposite where I was sitting. * * * Mr. Hadley was probably about eighty-three years old at that time if he was as old as indicated here when he passed away. I wouldn't have taken him to be that old. He was pretty rugged for a man of that age if he was that old at that time." He also testified: "I acted as his attorney when he was settling the estate of his son Ben, and I or our office did abstract work for him and he was in the office a good many times, so I felt pretty

well acquainted with him. Quite a few times I discussed matters of business and politics with Mr. Hadley during the period I knew him. A few times he came in and just talked the economic situation over with me."

After providing for payment of debts and expenses the testator devised and bequeathed, in section 2 of his will, to his executor, L. E. Hadley, all the remainder of his property for conversion into cash, for division as follows: One seventh thereof to each of the following children, to wit, M. W. Hadley, L. E. Hadley, Alice Cochran, O. E. Hadley, and Ruby Needles; to his grandchildren Naomi Hadley and Neal Hadley, children of Ben Hadley, deceased, one-fourteenth portion each of his estate; "the other one-seventh portion of my estate, I will, devise and bequeath to my son L. E. Hadley in trust for my son C. R. Hadley charged with the following: * * *." The will recited that the son C. R. Hadley was indebted to his brother O. E. Hadley on a note of $3000, dated January 2, 1932, with six per cent interest; to his sister Alice Cochran on two notes of A. R. Gleason in the sum of over $400 each, representing an indebtedness of C. R. Hadley to his sister Alice; and to Grace Hadley, widow of Ben Hadley, in the sum of $700, with interest from March 1, 1932. The will further provided that if the debts of C. R. Hadley listed above were not paid at the death of the testator, the trustee of the one-seventh interest held for C. R. Hadley should pay from the said trust fund to the respective creditors of C. R. Hadley the indebtedness owing to each in full, if the trust fund was sufficient, if not the payments were to be prorated. In the event there was a balance remaining in the trust fund after payment of said debts, it was to be held by the trustee as a spendthrift trust, and the income therefrom annually paid to C. R. Hadley.

The will further provided:

"I further will and direct that said sums to be paid to the said Alice Cochran, Alice Cochran guardian, Grace Hadley and O. E. Hadley, unless paid prior to my death shall be paid by my said trustee absolutely, and that same shall be paid whether barred by the statute of limitations or not, or whether the same

has been listed as a part of the obligations of C. R. Hadley in any bankruptcy proceedings or not, and whether the said C. R. Hadley claims to have any defense to the payment of said notes or not."

While O. E. Hadley and Grace Hadley are charged with undue influence in the objections to the probate of the will, no evidence of any kind in support of the charge against either was offered. Such evidence as was offered in support of-the charge of the exercise of undue influence over the testator by Alice Cochran is of trifling probative worth.

Contestant assigns two errors on which he relies for reversal. One being that the court erred in holding there was no evidence of undue influence at the time of the execution of the will. The second error of the court being its refusal to permit evidence of certain declarations of the testator regarding undue influence.

I. For the purpose of passing upon the first error assigned we will consider, in the aspect most favorable to the contestant, all testimony offered in his behalf or erroneously rejected, with respect to the charge of undue influence by Alice Cochran. It was conceded that she lived in her father's home from 1922 to his death in 1948, and that she had at times deposited money for her father in his bank account and had drawn checks upon it. It appears that one of the sons had performed the same service, and that the father deposited money and wrote his own checks at times.

It is conceded that she went with her father to the home of Charles when her father asked for and received the first will.

Contestant puts a strained meaning upon his own testimony in which he stated that Alice told him the "second will was a better one than the other one" and that "she hadn't done anything more than we [C. R. and M. W. Hadley] had done, and that she had a right to make one if we made one." This took place during a quarrel after the testator's death. Each was making accusations against the other. If she had said that she had as much right to make a will for her father as they did, it was not an admission she had in fact exercised such assumed right and made the will.

Contestant contends that Alice dictated her father's business decisions. In support thereof he points to his own testimony on direct examination, as follows:

"Q. Do you recall having some conversation with your father up at the home there when Mrs. Cochran was present with reference to buying some cattle your father wanted to buy? A. Yes, I do. * * * I don't just recall the year exactly, but along about 1934 or 1935—something like that. My father said to me on that occasion, 'I wish you would go buy me some of those polled shorthorn cattle,' and I said, 'How many do you want?' and he said, 'I would like to have twelve or fifteen of them.' My sister Alice Cochran was present. About the time he decided to buy them I got ready to leave, and she said, 'Dad, what in the devil is the matter with you? You can't take care of those cows.' That was about all that was said about them." (No cattle were bought.) '

When one considers that the father was well past three score and twenty years, with only his daughter to care for him and to perform the work to be done about the place, it is apparent that she was simply giving sound and sensible advice to both her father and her brother. Good counsel from a dutiful daughter to an octogenarian father, under the circumstances, was a protection to him and not a domination of him.

▇ II. The second assignment of error pertains to certain declarations of the testator testified to by the contestant. Without fixing the time of the declaration, he testified: "Well, he [testator] said he couldn't do as he pleased any more and he said he had to listen to somebody else or have a lot of trouble in the home. Therefore, he just gave up to a lot of things to keep from having trouble."

M. W. Hadley, brother of contestant, being asked if his father had ever complained of his lack of liberty to make his own business decisions, answered: "Why, pop told me year after year before he died, 'I can't be my own boss any more.' "

These comprise all of the declarations whose rejections are complained of. Had the objection been made that the witnesses were incompetent under the "dead man" statute the objection

would have been good. But whether in, or out of, the record this testimony does not aid the contestant nor tend to establish in any appreciable degree the issue of undue influence on the part of Alice Cochran.

III. There is no substantive evidence or independent evidence, other than these declarations, tending to show that Alice Cochran exercised any undue influence upon her father in the execution of his will. Declarations of a testator that a proponent or beneficiary under a will, or any other person, annoyed, harassed, importuned or restricted a testator's liberty of action or bossed him in matters generally, whether before or after the execution of his will, so that the testator stated that he acceded to the pressure to have peace in the family or peace of mind are never received for the purpose of showing that undue influence was in fact used by any such person in procuring the execution of the will. If there is such other independent and substantive evidence tending to show that undue influence was in fact used to procure the will, then these declarations are admissible as corroborative of such evidence and as tending to show the effect on the testator's mind of whatever undue influence was exerted upon him, and, in general, his mental and emotional condition in that respect, as his own external manifestations, rather than as evidence of the truth or untruth of facts relative to the exercise of undue influence upon him. Standing alone these declarations of what occurred in the past, in the absence of substantive evidence of undue influence effective upon the testator at the time of the execution of the will, are no more than hearsay evidence on that issue. This court has repeatedly announced the rules and principles of law above-stated. See Johnson v. Johnson, 134 Iowa 33, 36–38, 111 N.W. 430, 432 (in which the court said on page 38 of the Iowa report: "As there was no substantive evidence, however, tending to establish the fact of undue influence, the error in striking such evidence [declarations of 'harassing annoyance'] from the record was without prejudice, as in any event the court must have directed the verdict for the defendant.") ; Bates v. Bates, 27 Iowa 110, 113, 114, 1 Am. Rep. 260; Zinkula v. Zinkula, 171 Iowa 287, 300–302, 154 N.W. 158; Graham v. Courtright, 180 Iowa 394,

404, 161 N.W. 774, 777 (where the court said: "The decisions of this court cited above are conclusive that the above evidence [declarations] is to be regarded as mere hearsay on the issue as to whether undue influence was actually exercised or exerted on the decedent, and may not be considered as bearing thereon."); Albaugh v. Shrope, 197 Iowa 844, 852, 196 N.W. 743; Stephenson v. Stephenson, 62 Iowa 163, 165, 166, 17 N.W. 456; Hughes v. Silvers, 169 Iowa 366, 371, 372, 151 N.W. 514; In re Estate of Klein, 241 Iowa 1103, 1117, 1118, 42 N.W.2d 593, 601; In re Estate of Johnson, 222 Iowa 787, 798, 269 N.W. 792; In re Estate of Rogers, 229 Iowa 781, 788, 295 N.W. 103, 106 (where the court said: "We have held there must be evidence, independent of declarations of the testator, of undue influence before such declarations may be considered."); Muir, admr. v. Miller, 72 Iowa 585, 590, 34 N.W. 429, 432 (in which the court said: "But it is nowhere held that prior declaration of an intention contrary to the subsequent disposition may be shown to establish undue influence.") See also In re Estate of Townsend, 128 Iowa 621, 623, 624, 105 N.W. 110, where the court stated:

"It is not enough to show that there was an opportunity to exercise the undue influence complained of, there must be evidence that it was exercised, and that it was instrumental in procuring the will. * * * There is no evidence that any one of them [proponents] ever had a word with the testator concerning the will, or the way in which he should dispose of his property, and, even if such evidence existed, it would not necessarily furnish ground for holding that there was undue influence exercised over the testator. Neither advice nor solicitation, however earnest or insistent, will vitiate a will, unless it be further shown that the freedom of the will was in some way impaired or destroyed thereby. * * * It is admitted, as we have seen, that the testator was of sound mind when the will was made * * * and under such circumstances, the evidence of undue influence should be clear and convincing."

Referring to the Townsend opinion, supra, the court in Zinkula v. Zinkula, supra, 171 Iowa 287, 302, 154 N.W. 158, 163, said:

"It is, however, stated in that case that mere declarations are of very little force, and amount to very little in themselves, in the face of a prima-facie showing that the testator was a thoroughly competent person, enjoying normal health, and under no apparent coercion or stress when he executed the instrument."

. This quotation is quite apropos in view of the testimony of the able and respected lawyer who drew the will. The will itself is in no way unreasonable. It is convincing evidence that it was the intention of the father to make a testamentary disposition of his property that was scrupulously fair to each person entitled to share in his bounty. There is no merit in either assigned error.

█ IV. The burden of proving undue influence which operated upon the mind of the testator at the very time the will was executed and to the extent that the will was the result thereof, and not the act of the testator, was upon the contestant. The decisions of this court have been consistent at all times in so holding. In re Estate of Eiker, 233 Iowa 315–317, 6 N.W.2d 318; In re Will of Richardson, 199 Iowa 1320, 1327, 202 N.W. 114; In re Estate of Heller, 233 Iowa 1356, 1365, 11 N.W.2d 586, and decisions cited in the cases just noted. The contestant failed to meet this burden.

█ █ V. The trial court was right in directing a verdict for the proponents. The rule to guide the court in such situation was well-stated by Justice Gaynor in Bales v. Bales, 164 Iowa 257, 275, 145 N.W. 673, 680, thus:

"The rule governing the court in the disposition of a motion for a directed verdict at the close of the evidence is that it is not the duty of the court to submit the case to the jury because there is *some* evidence introduced by the party having the burden of proof, unless that evidence is of such a character that it would warrant the jury in finding a verdict in favor of the party introducing such evidence." (Italics ours.)

The judgment is—Affirmed.

All JUSTICES concur.