IN RE ESTATE OF JOHN GROEN.

JOHN TROFF et al., contestants-appellants, v. JOHN GROEN et al., proponents-appellees.

No. 48400.

(Reported in 62 N. W.2d 143)

JANUARY 12, 1954.

REHEARING DENIED MARCH 12, 1954.

Della Welter, Linnan & Lynch and D. C. Hutchison, all of Algona, for appellants.

Fisher & DeWaay, of Rock Rapids, for appellees.

BLISS, C. J.—The testator, John Groen, a resident of Winnebago County, Iowa, died November 29, 1952, at the age of eighty-two years. On November 25, 1949, he executed his last will and testament, bequeathing and devising all of his property to Alida Groen, the widow of Dick Groen, a deceased brother of the testator. She died on November 28, 1952, the day preceding the day of the testator's death, leaving as her only heirs twelve children, who are the proponents of John Groen's will and appellees herein.

The testator never married. He was survived by no brother or sister. He left as his nearest next of kin several nieces and nephews. Contestant John Troff is the son of a deceased sister. The other contestants are daughters of a deceased brother, Sidney. The proponents are children of his deceased brother Dick, and his wife, Alida, as noted above. The testator was also survived by children of his deceased brother George, but they are not parties to this action.

On December 18, 1952, contestants filed objections to the will on the following grounds: (1) the testator was of unsound mind and lacked testamentary capacity (2) the testator was so under the influence of others that the will was their will, and not his will, and (3) the will was not executed or published as required by the statutes of Iowa. The last ground (3) was withdrawn. During the trial contestants amended their objec-

tions by adding a fourth ground, to wit, that when the will was executed the testator was "79 years of age, in failing physical and mental health, of poor eyesight and could neither read nor write, and was wholly unable to understand or comprehend the contents thereof and did not in fact know, understand or appreciate the contents of said will."

At the close of contestants' testimony proponents filed a motion for a directed verdict in their behalf on the ground that contestants had failed to establish any of their objections to the probate of the will. The court then said to the attorneys for proponents: "You may proceed with your argument * * * before you do so, I think I may say that you won't need to spend any time on that part of the motion relating to unsoundness of mind and lack of testamentary capacity on the date of the execution of the will in question, as I am convinced that such unsoundness of mind or lack of testamentary capacity has not been established sufficiently to permit that issue being submitted to the jury, and that that part of the motion directed to that phase of the case should be and is sustained." At the conclusion of the argument on the motion, the court said: "Division I of said motion having reference to unsoundness of mind or lack of testamentary capacity of decedent as alleged by contestants is sustained, and the balance of said motion is at this time overruled."

We are in accord with the conclusion of the able and experienced trial court that the issue of testamentary incapacity justified limited consideration. Many of the 339 pages of the printed record are devoted to testimony on this issue, which is largely of the same nature and repetitious. As too often happens in litigation of this character the testimony of the witness is strongly influenced by his interest.

John Groen came to this country when a boy less than ten years old. Such book education as he received was limited to the lower grades of the schools. There is testimony for contestants that if he could read at all it was not "much." The same is true of his writing. The only evidence in the record is that he could write his name. Several specimens of his signature in the record are clearly legible. While it may be said that he was an illiterate man, it cannot be said that he was an ignorant

man. By his industry, thrift and good judgment he acquired a very comfortable competence. He became the owner of an eighty-acre farm in Hancock County, Iowa, just south of the town of Woden, and a quarter section farm in Winnebago County, Iowa, near the town of Buffalo Center, in that county, and the town of Titonka in Kossuth County. He never personally operated these farms but leased them to others. He lived as a bachelor on a ten-acre tract on which he raised some crops and livestock.

He was a stocky, heavy-set man about five and one-half feet tall, and with advancing years he became very heavy for his height, so much so that his legs and feet troubled him and he had much difficulty in walking, and especially in stepping to a higher or lower elevation. With the aid of a cane or two he could get about slowly on a level surface, but needed help in getting in or out of a vehicle. This disability compelled him to give up his bachelor quarters and he lived about among his relatives in the neighborhood of his farms. For a time he stayed with contestant John Troff, who was a bachelor, and then in the family of contestants Grace Wubben and Henrietta Stratman, and later in the home of Anna Honken, also a contestant. During his later years he made his home with the latter.

Contestant Troff and the contesting nieces and their husbands and children were witnesses in the trial. Their testimony followed the customary pattern in these contests. They told how the testator after 1942 failed physically and mentally, grew neglectful and careless of his person and clothes, forgot where he put his personal articles, misplaced his money pouch and papers, failed to recognize on one occasion a child in one of the families, sometimes repeated his questions after they were answered, was untidy at the table, his sight and hearing failed, had difficulty in controlling his body eliminations, sat around and slept, counted the rungs in the chairs, had to be helped up and down stairs, and in and out of automobiles, and be taken to the bank and to the grain elevators, to the barber, and the banker or they had to come to where he was staying.

The matters covered by this testimony were almost entirely due to physical disabilities and ailments not uncommon in old

age. There was no evidence that he did not manage his property or business affairs or that anyone advised him in these matters. Even the evidence in behalf of the contestants is all to the contrary. He made a confidant of no one. He was distrustful of others. He kept his business transactions to himself. When anyone surprised him when examining his money wallet or counting money he immediately put it away. He leased his farm land usually on share rent. He attended to the collection of his crop checks at the elevators himself. He did his banking business with his banker at Titonka at the bank or the banker came to where he was staying. His banker testified: that Mr. Groen sometimes asked his advice in bank transactions, but did not always follow it; that he determined for himself when he came to the bank with money how much he would deposit in a certificate, or in his checking account, or would carry away in cash; that he attended to the renewal of his numerous certificates of deposit, and whether he would take the interest in cash or leave it in the renewed certificates. He usually paid his taxes personally, in cash or by checks, some of which were in evidence. He remembered to attend to his income-tax reports. On one occasion he asked contestant Mrs. Wubben to help him in this. Usually he would give the data for his income tax to Mr. or Mrs. Honken with whom he was staying and they would take it to the bank, and Mr. Boyken, president of the bank, or one of his sons would prepare his income-tax reports. This continued during the last years of his life.

There was neither lay nor expert opinion testimony given that the testator was of unsound mind when he made the will, nor at any other time. No such inquiry was directed to the eighteen or more witnesses who testified for contestants. There was no testimony that would support such answer.

■ I. The essentials of testamentary capacity are that the maker of the will then had the mental capacity: (1) to understand the nature of the instrument he was executing (2) to know and understand the nature and extent of his property (3) to remember the natural objects of his bounty, and (4) to know the testamentary disposition he wished to make. We have so announced from our earliest to our latest decisions, so repetition

of citations is needless. See Perkins v. Perkins, 116 Iowa 253, 259, 90 N.W. 55; In re Estate of Rogers, 242 Iowa 627, 630, 631, 47 N.W.2d 818; In re Estate of Ransom, 244 Iowa 343, 378, 57 N.W.2d 89, 108. The burden was on the contestants to establish that testator was lacking in one or more of these essentials. There is no such evidence in the record.

Though contestants and some of their witnesses testified that the testator had failed mentally during his later years, they gave evidence of no facts to support their opinions. The facts as disclosed by other testimony offered by contestants establish that though old age was taking something from him mentally he continued to attend to important business matters down to his last sickness in his final days. William Boyken, president of the Titonka Savings Bank, for many years was in closer touch with John Groen in a business way than anyone else. The following matters are from his testimony as a witness for contestants: Groen had been a customer of the bank for more than twenty years. He had a safe-deposit box in the bank for a good many years. For many years he used the bank simply as a place to deposit money on time certificates. He had money on interest at the bank continuously since he became a customer of the bank. He always carried a substantial amount of money on his person. He paid cash for his purchases and other obligations. As long as he was physically able he always came to the bank— "Since that time I have always gone to wherever he was staying to take care of his banking business for him. When he was staying at Honkens I would go to the Honken home and pick up what he had in the way of checks or money for deposit in the bank. He would endorse the checks and I would take them with me to the bank. He usually placed the money in the bank on time deposits. He didn't open up a checking account with us until November 28, 1951. I handled the transaction myself when he opened his checking account with our bank at that time. That was about a year before he died. I never knew of his having any other checking account than the one opened by him in our bank. * * * He had in our bank in certificates of deposit or time deposits, at the time of his death, about $20,000, and on checking account at our bank about $1300. He bought

some government bonds through our bank and some of these were left at the bank. About $1600 worth maturity value of bonds were in the bank for safekeeping and about $5000 worth were in his safe-deposit box at the time of his death. I saw John Groen in the fall of 1952 in the John Honken home before he went to the hospital. I was there October 3, 1952, for the purpose of checking up with him and picking up some grain checks he had, and to renew a certificate of deposit. Some certificates of deposit were renewed that day, a little over $14,000 worth. I was back there again about ten days afterward to deliver him the certificates of deposit. He didn't leave the certificates of deposit with me, but kept them on his person. I was there November 6, 1952. That was for the purpose of renewing another certificate of deposit of $2000. That was not the last time I saw him alive, as I saw him at Honkens on the day that he went to the hospital. I transacted no business with him at that time. He was sick. * * * The certificate of deposit of November 6, 1952, I don't believe was renewed, but I am not positive as to whether it was a renewal or a new deal."

The bank ledger sheet of the John Groen checking account and deposit slips show that the certificate of deposit of November 6, 1952, for $2000 was not a renewal, but it was a new deposit, as Mr. Boyken discovered on further investigation. On November 11, 1951, Groen deposited five checks of the Farmers Elevator Company of Woden and Buffalo Center, each payable to him, totaling $1822.72. He took $25 in cash from the bank and opened his checking account as of November 28, 1951, with an initial deposit of the balance of those checks amounting to $1797.72. He wrote checks on the account that were debited to it as follows:

"$179.45 and $7.50 on Jan. 31, 1952—$125.68 on Feb. 19, 1952
$353.00 on Feb. 23, 1952—$ 17.14 on May 1, 1952
$ 1.20 on July 23, 1952—$600.00 on Nov. 5, 1952"

On, October 3, 1952, John Groen deposited six checks payable to himself for a total of $1332.65, of which $1000 was placed in a certificate of deposit, and the balance of $332.65 was credited to his checking account on October 6, 1952. On October 11, 1952,

Groen deposited a check of the Farmers Elevator Company of Buffalo Center for $279.74. On November 6, 1952, Groen received two checks from the elevator company of Buffalo Center payable to him, totaling $2217.04, of which $2000 was placed on a new time-deposit certificate dated November 6, 1952, referred to by Mr. Boyken, and the balance of $217.04 was credited to Groen's checking account. After Groen's death, and on December 4, 1952, currency found in his effects to the amount of $528.79 was credited to the checking account. The account was closed after his death by an estate check of $1871.97 on December 26, 1952.

Of these banking transactions Mr. Boyken testified: "I know of my own knowledge the last ·check of $1871.97 was a check drawn by the administrators of the John Groen estate. The other withdrawals shown were made by John Groen himself in his lifetime. That is also true of the deposits shown on the exhibits. The deposits shown on Exhibit D [bank ledger sheet] were deposits made by John Groen himself during his lifetime."

The banking transactions shown above, involving substantial sums of money, during the last year of the testator's life and two years after his last will was drawn, indicate that he was personally managing his farms, collecting his rents, and building up bank assets just as he had been doing for twenty years before, but with better judgment, as he changed to doing business by bank checks instead of by currency.

The check of $600 dated October 14, 1952, drawn by the testator, and payable to John Honken, husband of contestant Anna Honken, has a notation on its face stating "Board to Sept. 26th." This is of some significance. Contestants in their attack on the will vigorously assert that the testator by his last will disregarded his blood relatives, who had cared for him and in whose homes he had lived, and gave property to a stranger in blood. They did not testify whether they were paid or not paid for services rendered to him, but it would be quite preposterous to infer that the testator was not paying his way.

The testator's brother Dick Groen and family moved from Winnebago County to Lyon County, Iowa, about 1909. Testator helped them move and assisted in getting them settled. Five of

the Dick Groen sons testified in substance: that their Uncle John came back in 1910 and 1911 and helped with the farm work. He was out again in 1917 to the funeral of their sister. He came again in 1920. His brother Dick died in 1935, but testator was not at the funeral. The widow continued to operate the farm with the help of her sons George and Carl until they married. The testator visited Dick's widow and children at the farm in May 1942 and remained until after October 1942. This date is fixed by the fact that the son George was married on October 1, 1942, and the family and others put on a mock wedding on October 5, as a burlesque on the real event, in which Uncle John (testator) took the part of the bride.

The widow was planning to leave the farm and move to Rock Rapids. The testator asked her if the farm was mortgaged and, being told that it was, offered to provide money to pay it, and the widow told him that when she sold the personal property she would have funds to pay the mortgage. She moved to Rock Rapids in 1943. In 1946 Carl, a son of Dick's widow, returned from service in the armed forces and the testator came to Lyon County and visited the family for a month or more. The son Carl had rented some farm land, and a group of farmers came with tractors and plows and had a plowing bee and plowed all of his land. The testator was present and discussed farm matters with the men and enjoyed the occasion. In 1948 the body of Dick, another son of the widow, who died in the foreign service, was shipped to Rock Rapids for burial. The testator came to the funeral, and went to Sibley so that he could get a wreath to put on the grave. While on this visit the widow's brother died and was buried at Titonka. The testator went with her and the family to attend the funeral services, and returned with them to Rock Rapids and remained a month or more. Alida Groen or her children visited John Groen and the other relatives in Winnebago County almost every year.

Contestants introduced in evidence a letter written by Alida Groen to one of the relatives in Winnebago County. The date stamped on the envelope was July 22, 1949. In the letter the writer inquired if and when Uncle John was going to visit her as she wished to give ample notice to one of her roomers to

vacate a room for him. He came to visit her again about the first of September, 1949, and remained until in December of that year. A young lady, Miss Mildred Levering, was rooming and boarding in the Alida Groen home during that time. She was twenty-two years old and was employed as a bookkeeper at the city light plant. She was not related to Mrs. Groen, but became acquainted with her through a granddaughter of the latter. Mrs. Groen and Uncle John Groen (testator) each had a bedroom on the first floor and Miss Levering slept on a studio couch in the parlor. A young man, who later married a granddaughter of Mrs. Groen, who was employed in Rock Rapids, lodged and had his meals in the Groen home during this period. He slept in the basement. Mrs. Groen had a kitchen in the basement where the members of the household ate their meals, except Mr. Groen who was unable to use the stairs. Mrs. Groen brought his meals on a tray to the kitchen on the first floor. Miss Levering sometimes performed this service. She often visited with Mr. Groen and when others were there he joined in the general conversation. He seemed to be most interested in farming and livestock and things connected therewith. He was able to move about the first floor and the front porch, where he often sat. He appeared to be happy and jovial and sometimes sang German songs for them. She never observed anything in his conduct or conversation indicating a poor memory. She saw him eat his meals and had occasion to observe his table manners, and saw nothing that attracted her particular attention in respect to this matter. He always greeted her when she came from work, and sometimes asked her about her work. On Thanksgiving he was a guest at the home of another relative.

With respect to his mentality, she testified: "From my observation and contacts and conversation with John Groen in the fall of 1949 just before and after Thanksgiving of 1949, I would say that John Groen was of sound mind. I would have no reason or occasion to say differently. So far as my observation went, he was not out of the way on anything that he did or said to indicate anything else than that he was of sound mind. * * * I never heard Alida Groen say anything to John Groen about making a will, nor did she ever say anything to me about it."

The other roomer at the Alida Groen home, Henry Walter, twenty-six, was a witness for proponents. He confirmed the testimony of Miss Levering as to daily life in the Alida Groen home. He testified that: He was at work all day but often visited with Mr. Groen in the evening when they were alone or in general conversation with callers. They were both at the family Thanksgiving dinner in the Dreesen home near Luverne, Minnesota. It appears that it was determined by lot or chance who would buy the turkey. Uncle John was undecided whether to make the trip, but he said when he heard he had to buy the turkey he would go. The witness saw Mr. Groen at the dinner. He usually took him to the barbershop. His clothes were neat and clean. He was laughing and happy and conversed generally with those about him—"There is no doubt in my mind but what he was of sound mind."

While John Groen was at the Alida Groen home and early in November 1949, Mr. O. J. Kline, fifty-three years old, who had been in the retail grocery and meat business in Rock Rapids, but became connected with the Lyon County State Bank as assistant cashier and farm representative or fieldman about February 1949, called at the Groen home in connection with his duties. Alida Groen had been a customer of the Kline store. She was not a customer of the bank and he called to solicit her business. She obtained a safe-deposit box and opened a checking account in the spring or early summer of 1951.

When he knocked at the door, Mrs. Groen invited him in and said she was going to have a cup of tea and asked him to join her. John Groen was sitting in the living room and she introduced him as her husband's brother. They shook hands and expressed their pleasure at meeting. She and Mr. Kline passed to the kitchen table and Mrs. Groen poured the tea and then took a cup to Mr. Groen. Kline told Mrs. Groen the purpose of his visit and she said she had papers in the house that should be in a safe-deposit box and she also said she wished to make a will and asked if "someone at the bank couldn't do it", or come to the house and do it. Kline told her that Mr. Crawford, vice-president of the bank, would be glad to come to the house and accommodate her. Mr. Groen then said he wished to make a will but it was hard for him to get around, and Kline told him to

send word to the bank whenever he wished the matter taken care of. About three weeks later, in the forenoon of November 25, 1949, Alida Groen telephoned to Kline that Uncle John Groen would like to see him and Mr. Crawford at the house in the afternoon. When these two men, after banking hours, knocked on the door of the Alida Groen home she called for them to come in, but did not appear. Mr. Kline came in and saw John Groen sitting at the kitchen table, and they walked back and Mr. Kline introduced Mr. Crawford to John Groen, who said: "Oh, this is the man who makes wills?" When told that he was, he said that he wanted to make a will. In answer to questions by Mr. Crawford he said he wished to give all of his property of every kind to his sister-in-law, Alida Groen, of Rock Rapids, in whose home he then was. He said he wished her to be executrix without bond. Mr. Crawford told him that he would go to the bank and type the will and then return. In about a half hour Mr. Kline and Mr. Crawford returned with the typewritten will and read it to Mr. Groen and asked him if he understood it, and he said he did and it was just the way that he wished it to be. John Groen signed the will as testator and at his request C. C. Crawford and O. J. Kline signed as witnesses, all signatures being made in the presence of the three signers.

When the will was executed Mr. Crawford put it in an envelope and handed it to Mr. Groen, who told Mr. Crawford to take it and put it in the bank for safekeeping. It revoked all earlier wills.

Mr. Kline and Mr. Crawford, as witnesses for proponents, testified that in their opinion John Groen was of sound mind when he executed the will. Each of them testified that Alida Groen was not present at any time when the making of the will was discussed by them with Mr. Groen, nor in the afternoon when the will was executed and witnessed.

We find nothing in the record that tends in the slightest way to establish that the testator was of unsound mind or was lacking in any respect in any of the essentials of testamentary capacity when he executed the will offered for probate, and that the trial court ruled correctly in taking that issue from the jury.

II. In 1942 John Groen was very sick. On March 10 of that year he executed a will that was drawn by William Boyken

of the Titonka bank. The testator was living in the home of Anna Honken at the time, and her husband, John Honken, and Mr. Boyken witnessed the execution of the will. It gave to John Troff the eighty acres in Hancock County. To the other four contestants, Anna Honken et al., it gave an undivided one-half interest in the Winnebago County quarter section, and the other undivided half was given to the thirteen children, naming them, of testator's deceased brother Dick and wife, Alida Groen. The nieces and nephews in each group were to share equally. The remainder of his property was given one third to John Troff, one third to Anna Honken et al., children of his brother Sidney shared equally, and one third to the children of his brother Dick, with equal shares. Boyken was named executor. The children of testator's deceased brother George were not beneficiaries. The will was given to Mr. Boyken to be kept in the bank, but some years later the testator withdrew it from the bank, which may have been after the contested will was drawn, and after his death it was found in the pocket of one of his jackets, with the envelope opened.

 Contestants argue that the revocation of the earlier will and the provisions of the second indicate undue influence in the execution of the latter will, but this is only conjecture. There is no evidence, of any substance, to support the objection that the execution of the proffered will was improperly induced by Alida Groen or by anyone else, and was not his own will and just as he wished and intended it to be. Contestants stress the fact that he never told any of them of the execution of the will of November 1949. It was reasonable and natural that he did not do so. He was living among them and wished no discussion or controversy over the matter.

III. One witness testified that while testator was living with John Troff between 1942 and 1947, he told him "that Troff was to have the eighty acres, but he didn't say a word as to what he was going to do with the other quarter." Another witness testified that in 1947 or 1948, while waiting for a silage cutter to be repaired he had a casual conversation with John Groen. The witness was asked the leading question, "Did he say anything to you about how he was going to dispose of his property?"

Answer, "Well, he said that he had his will all fixed up so Johnny Troff was to get the eighty that he owned, and the others were to get the quarter section. He did not say who the others were. He said that was the way he wanted it to be. I was not interested particularly in the matter."

Frequently in litigation of this kind, witnesses testify to declarations of this type. Courts should and do consider them with care and skepticism, because persons, generally, do not make such disclosures in casual chats, particularly those who are as closemouthed about their property and business matters as the testimony of contestants shows John Groen to have been. These remarks, if made, were some years before the execution of the will before us. The testator, if he wished to, of course, had the right to change a prior testamentary disposition of his property. It was his property acquired by his efforts and conserved with thrift. It was his privilege and right to dispose of it as he wished, or thought best.

One witness, husband of a contestant, testified that on John Groen's return from Rock Rapids in December 1949, he said "they were trying to rob me." The testator did not specify to whom the word "they" referred, according to the witness. Alida Groen and two of her sons and their wives brought the testator home on this return. There is no evidence that the alleged complaint was made in their presence. There is no evidence that on his return he complained that he had been over-pressured into the execution of the will. The declarations noted above may be considered only when the fact of undue influence has been independently established, and then only as bearing upon the susceptibility of the testator to undue influence, or his capacity to resist it. In re Estate of Johnson, 222 Iowa 787, 798, 269 N.W. 792; Johnson v. Johnson, 134 Iowa 33, 36, 111 N.W. 430; Bates v. Bates, 27 Iowa 110, 113, 1 Am. Rep. 260; Graham v. Courtright, 180 Iowa 394, 404, 161 N.W. 774; In re Estate of Rogers, 229 Iowa 781, 788, 295 N.W. 103; In re Estate of Klein, 241 Iowa 1103, 1117, 42 N.W.2d 593; Muir v. Miller, 72 Iowa 585, 590, 34 N.W. 429; In re Estate of Rogers, 242 Iowa 627, 629, 47 N.W.2d 818; In re Estate of Hadley, 241 Iowa 1280, 1287, 1288, 45 N.W.2d 140.

The briefs cite numerous cases involving the sustaining or rejection of motions to direct on issues like those involved herein. The principles of law involved are well recognized. A discussion of them would serve no purpose as the precedents are of little aid because of differences of the facts.

We have carefully studied the record and the briefs and arguments and it is our conclusion that if all of the items of evidence, considered singly or as a whole, be accepted as true, the contestants have failed to establish any objection to the probate of the will.

The judgment is—Affirmed.

OLIVER, WENNERSTRUM, SMITH, and THOMPSON, JJ., concur.

MULRONEY, HAYS and LARSON, JJ., dissent.

MULRONEY, J. (dissenting)—I would hold the record presents a jury question, at least on the issue of undue influence, and would therefore dissent from the majority opinion. I do not feel the majority opinion presents a review of the testimony in the light most favorable to the contestants which I understand is what should be done when passing on the correctness of the ruling on the motion for directed verdict. See In re Estate of Eiker, 233 Iowa 315, 317, 6 N.W.2d 318, 320, where the first assignment of error questioned the correctness of the ruling on the motion to direct the verdict on the issue of undue influence and we said: "In deciding the issue presented by appellant's first assignment of error, appellee [contestant] is entitled to have the testimony considered in the light most favorable to her."

There is little in the record about John Groen's early life, save that he came to this country from Germany when about eight years old and he lived all of his life around Buffalo Center. He was a bachelor and he could not read and he could not write, except that he could with some difficulty sign his name. The story of his life, so far as this record is concerned, really starts with 1942 when John Groen was about seventy-two years old. In the early part of that year he was living alone on a 10-acre tract. Many nieces and one nephew lived on farms in the same neighborhood. All of John Groen's sisters and brothers were

dead. John Groen stayed at home alone. He never went to shows, never went to any church, never had nor drove an automobile and took no interest in any activities, except the management of his two farms which were then rented, and it does not appear that he had any close friends.

Sometime in the winter of 1942 John Groen took sick and for a time some of the nieces brought meals to him and then in February he was moved to the home of his niece, Mrs. John (Anna) Honken. From February 1942 until he died ten years later, John Groen lived at the homes of his various nieces and one nephew who farmed in the Buffalo Center area, except for three or four visits totaling a few months at the home of Mrs. Dick (Alida) Groen in Rock Rapids. He was very sick when he arrived at Mrs. Honken's home in February 1942. He was bedfast and under a doctor's care, apparently with some heart ailment, and he remained in bed, with all meals served to him there, until the following May. The proponents' testimony shows that it was thought that John Groen would die and Alida and two of her children came to Mrs. Honken's home to see him. Mrs. Honken testified that when they came, "they said that they came to see him [John Groen] to talk to him about encouraging him to make out a will." It is admitted Alida and her two sons, and the wife of one of them, spent about two and a half hours of their three-hour visit in the bedroom with John Groen and one of the sons later testified "he was a very sick man." But the sons stated the talk was general "about crops and weather." Mrs. Honken testified she was out of the sickroom several times while Alida was visiting with John Groen alone. She could hear a conversation in the room but whenever she went back into the room the conversation stopped and John Groen's "face was flushed" and "he appeared very excited."

Mrs. Honken testified that in May, John Groen had recovered to the extent that he could walk around with a cane although he was "somewhat crippled." At first he continued to sleep a good deal but later he spent his time walking from one place to another in the yard and he ate his meals with the family. She said, when questioned as to his mental condition, that he was "more or less unconscious of what he was doing or had done just before" and that he was quite forgetful.

John Groen remained at Mrs. Honken's home until October 1942 when he went to live with his bachelor nephew Johnny Troff who owned and farmed an eighty adjoining John Groen's eighty-acre farm. Johnny Troff was then in his late thirties and John Groen lived with him for a little over four years or until February 1947. They had no housekeeper and John Groen did no work on the Troff farm and no housework except that he occasionally dried the dishes. He could get around with a cane but he was very forgetful and he would ask a question and after it was answered ask the same question again. Johnny Troff took him to the barber and to the bank in Titonka to see Mr. Boyken, the banker, about every two weeks. He had to help him in and out of his car. John Groen gradually became such a care that Johnny Troff was afraid to leave him alone in the house. He was so forgetful that he would leave things on the stove or leave the stove door open and fill the house with smoke while Johnny Troff was away working in the fields. Sometimes he would leave wet handkerchiefs on the stove to dry and forget he had placed them there, and once he fell and fractured his arm.

In February 1947 John Groen went to the farm home of another niece, Mrs. Fred Wubben, but he only stayed there a few weeks and he was then brought back to stay at the Honken home. He stayed at the Honken home until August 1948 when he went to the funeral of his nephew Dick in Rock Rapids. He stayed a few months with Alida on this occasion and when he returned he stayed at the Honken home until the September 1949 visit to Alida, when the will in question was executed.

Mrs. Honken and her husband and some of her children, and others who visited in the Honken home, described in much detail the change in John Groen, physically and mentally, during this second period in the Honken home—about February 1947 to September 1949.

Many witnesses testified as to the marked change and steady decline in John Groen's mental and physical condition. Mrs. Honken testified: "He was getting more feeble. I noticed he was getting more forgetful. * * * For instance, a check or checks that he had in a certain place, and after he would get a check, he would forget that he had gotten it. He would receive a

check and put it somewhere and then forget that he received it and that he had it." She said his physical condition grew gradually worse and that he was not able to walk about by himself and it took two persons, one on each side to get him in and out of a car. When asked about his mental condition during this period she replied: "Well, he didn't trust himself to do anything, anything in the way of business at all." She went on to explain that he would ask her to help him and she would read his mail to him and since he had difficulty in keeping track of his papers she would try to find them for him. She said he carried his money on his person in a salt sack or sugar sack and he placed it under his pillow at night and on occasions he would lose the sack or leave it in the bed and she would find it for him.

Mr. Honken testified John Groen could not read and could not write but could sign his name with difficulty. The difficulty was a sort of palsy or shaking of his hand. He said he wore his clothes out where his hand would shake against his leg. When asked how John Groen occupied his time when in his home he replied: "Well, he would sit and count the rounds on his chair with his cane, and that is about all he would do; that and sleep; he spent a good deal of his time just sleeping." Mr. Honken said he could not see or hear well and could not get around without someone helping him on each side. He said his memory was poor and "he never knew from one day to the next what day of the week it was." Mr. Honken said that for the last four years before he died John Groen "couldn't take care of his business affairs. He could not do it by himself. My wife helped him in those matters." He too told of how John Groen handled his money and papers by keeping them in his billfold in the sugar sack. He said that during the last four years he had always gone to the elevators in Buffalo Center and Woden to get John Groen's checks for him and during the last three years of John Groen's life he had not gone to the bank at all. Instead they would call the banker to come out and pick up his checks. He always paid John Groen's taxes and John Groen would either give him the money or reimburse him.

All of the above evidence was corroborated in most all particulars by other witnesses. The Honken children, Clyde, Sadie

and Ernest, told the same story, and Mrs. Fred Wubben, another niece, gave similar evidence. She illustrated his forgetfulness by saying he would ask how old some person was and after it was answered ask the same question over again. As she said: "He would ask a question and it would be answered and then in a few minutes he would ask the same question right over again." She said he spent the few weeks he was in her home in 1947 just sitting in a chair sleeping or sometimes listening to the radio if someone turned it on. "He did not operate it at all himself." Mostly he just listened if there were others in the room talking.

Robert Fisher who lived about 160 rods from the Honken home and exchanged work with Mr. Honken said he was in the Honken home about every week and frequently saw John Groen when he was living there. He saw John Groen outside the Honken home two or three times during 1948 but he said: "Later on he began to fail more and got quite bad and got to where he couldn't get around unless he had help, with usually a man on each side of him. * * * His toilet and table manners were very poor. He seemed to trust no one in particular. I remember when he was losing his money as has been testified to here and that John Honken insisted that he should take it to the bank and John Groen didn't want to." He said John Groen could not make it to the kitchen without "a man on each side of him" and Mrs. Honken gave him his meals on a tray. He said John Groen always seemed very fond of Mrs. Honken and "if he needed a little help with anything she always seemed to give it to him."

George Roth, a farmer in the area of the Honken home, related a conversation he had with John Groen on the porch of the Honken home in 1947 or 1948 when John Groen told him he had his will all fixed and Johnny Troff was to get the eighty that he owned and the others were to get the quarter section. A. R. Guernsey who was a neighbor of Johnny Troff's gave similar testimony saying he saw John Groen often when he was living with Johnny Troff and "he said to me several times that Johnny Troff was to get his eighty that laid beside Johnny Troff's eighty, and that he was leaving it to him so as to make

Johnny Troff a quarter section." He too told of how it took two people to help John Groen get around.

Mr. William Boyken of the Titonka Savings Bank testified as to his dealings with John Groen during the twenty years that he was a customer of the bank. He said he came to the bank two or three times a year up to August 1949, after which he never came to the bank. He stated: "His physical condition from the year 1942 up to the time of his death was not good. In earlier years of that period I think he walked some with the use of a cane or two canes. In the later years, he had to have support of a man or two men, one on each side of him. He never was too alert but his mental condition very gradually got worse. From 1942 progressing to the time of his death. From my acquaintance with him and business transactions with him, l would say he was not educated, but uneducated." Mr. Boyken went on to say John Groen could not read and that he had a hard time writing his name. He stated: "He would have to sit by a table and have support and he would never use a pen but his pencil, and he was very unsteady and it took him quite awhile to sort of find himself and it would take him a long time just to sign his name. In later years his hand seemed to tremble and shake like a person with the palsy. I have observed him scratching or rubbing his hands on his overalls. He would be sitting in a chair and rubbing his hands on his overalls above the knee, and have his overalls worn out on that spot where he scratched his hands on them. In the past years and when he came to the bank I never waited on him at the bank counter because of his physical condition, and because it was so hard for him to get around and stand. He couldn't stand, and so if he came in we had him sit in a chair in the middle of the room or in the bank room in either one of those two rooms."

Mr. Boyken explained the nature of the business he did for John Groen, which consisted of depositing the checks he brought in on time deposits. These certificates of deposits began building up since 1932 and at the time of his death amounted to some $20,000. Sometimes John Groen would take part of the check deposits in cash and the balance in time deposits. John Groen had no checking account until November 28, 1951, or the last year of his life. Mr. Boyken or his son usually made out

John Groen's income-tax returns. Mr. Boyken testified: "In 1942 at his request, I made a Will for him. He was at the Honken home where he was staying, and I think that was the day before this Will was dated, and John Groen was there then in the bedroom, and I saw him there and he asked me if I could draw a Will for him. He was in bed at the time. I told him that I could. That I could come back sometime later and bring some material to write on and to draw it up for him and he asked me to do so. Later I went back and wrote the Will for him as he asked me to do."

This 1942 will gave the eighty acres to Johnny Troff and made disposition of the balance to his nieces and nephews including Alida's children; and right here it would be well to mention that Anna Honken testified that she saw this will in 1948 or 1949, she could not remember positively which year. She said: "Uncle John had taken some papers from his pocket in a jacket that he had been wearing and this [will] was in those papers in a sealed envelope, and he opened it at that time and asked me what it was." She told him it was his will and he put it back in the envelope and put it in his pocket and it was found in his jacket pocket after his death and turned over to Mr. Boyken, the named executor.

In the latter part of July 1949 Mrs. Honken received a letter from Alida Groen in Rock Rapids in which she said: "Say is Uncle John intending to come and stay with me for a little while then please let me know ahead as then I will have to tell Minnie to get a different bording place as she has that bedroom and yous know a person should tell them a little ahead of time as bording places are hard to get will you please write and tell me would like to know."

Presumably Mrs. Honken wrote, for in September 1949 John Groen was taken to Alida's home in Rock Rapids by Mr. and Mrs. Fred Wubben in their car. Two of Alida's children and their wives brought John Groen back to Winnebago County and to the Wubben home about December 5, 1949—about ten days after the date of the will in question. Joseph Wubben, a son of Mr. and Mrs. Fred Wubben, testified that at the supper table the night John Groen returned he said "that the only thing

they wanted him there [at Rock Rapids] for was his money", and he said "he wanted to come home."

Clyde Honken, a son of Mr. and Mrs. John Honken, testified as to statements made by John Groen shortly after his return when he said "if they didn't bring him back he would find a way to get back himself." Clyde's sister, Sadie, heard a similar statement and his brother Ernest testified John Groen said shortly after he returned from Rock Rapids "that he couldn't stay there any longer, that they were trying to rob him." Fred Stratman, the husband of John Groen's niece, testified: "When John Groen came back from Rock Rapids in 1949 in December he seemed excited. I wasn't there when he first got back. * * * It was probably a few days before I got to Wubben's to see him. * * * He was excited, he said, referring to the folks at Rock Rapids, that they were trying to rob him. He said that to me at our place. I think he came back in December 1949 and this was in January, about a month later, maybe a little over a month. That was after he came to our place, about a month later, maybe a little over a month."

After living for a few months at the Wubben and Stratman homes, John Groen arrived back at the Honken home in March 1950 where he lived until he went to the hospital the week before he died, or November 1952. His condition grew worse. Many times he lost all control of bodily functions. He never went to the bank but Mr. Boyken would call and pick up his check deposits. The Honkens would call Mr. Boyken to come out and they became apprehensive about the large amount of cash he had and insisted over his protests that he deposit the cash in the bank. They picked up his checks at the elevators and paid his taxes for him. The checking account which he opened in November 1951, a year before his death, seems to be the first checking account he ever had. It was not very active. It shows five deposits and six checks. It is admitted the checks were filled in by other persons and the photographs of the checks shows the laborious, almost unreadable, signature of John Groen.

Many witnesses testified that John Groen was worse mentally and physically immediately after his return from the 1949 visit to Alida's. Mrs. Fred Stratman, at whose home John Groen lived during the early months of 1950, said: "While he was there

at our house his physical condition was not at all good. He spent a great deal of time sleeping. He would be in bed early and get up late and then would sleep most of the time after he did get up. Q. And did he seem to have any interests in anything in particular as you observed it? A. Just momentarily some times, that is he would appear interested at first but his interest wouldn't continue at all. It was only for a fleeting moment. He would ask about something and when he was answered it apparently wouldn't register in his mind and his interest would only be very short. His memory seemed to be getting worse continually and it was very poor."

Mr. Fred Stratman gave much the same testimony. He said: "You couldn't talk and visit with him as he got things mixed up and seemed to be unable to carry on a conversation. He would start to talk for just a little and then got things mixed up so that you couldn't talk and visit with him. He usually slept until noon and then he would get up and be in his chair for the rest of the day."

After staying at Stratman's about three months he went back to the Honken home. Ernest Honken testified: "When he first lived at our house in the year 1947 he was able to get about the house and to the bathroom by himself. When he came there in early 1950 when he first came back he could sometimes make it by himself and sometimes he couldn't but he gradually got worse, so after a while he couldn't at all. His eyesight was poor. I never saw him read. I never saw him write. When he was up during the day he spent his time sleeping a good deal of the time and then he would be sitting in his chair when not sleeping and take his cane and mark off the linoleum. Take his cane and point off from one angle to another the marks and figures in the linoleum and kind of trace those nearest him with his cane. That was about the limit of his activity. I am now referring to the time after he came back from the Rock Rapids visit."

The relatives stayed with John Groen when he was in the hospital, and Mrs. Fred Stratman who stayed with him all night for the last six nights before he passed away said "he continually called for Anna [Honken]." She said he was not in a coma unless possibly the last night. Alida Groen died in Rock Rapids

the day before John Groen died, and about a week after John Groen died, Orvel and Ben Groen (children of Alida) and their wives drove to the Honken home and showed Mrs. Honken a copy of the 1949 will in question. She testified: "They said * * * their mother Alida Groen had then died * * * and they said they had opened up their mother's box and found this Will among her papers. * * * When they said that my husband and my father-in-law were there. That is the first that I knew of any such purported Will."

Ben and Orvel and their wives had dinner at the Stratmans on that day before they returned to Rock Rapids. Fred Stratman testified while at their house Ben said: " 'When we went to the bank and got mother's box and were going through the papers in her box we found this.' And then he handed me an envelope with a paper in it and I read it and then handed it to my wife and he said when he handed it to me that that was a copy of it, of the paper [1949 will] he said they found in their mother's bank box."

The story of the drawing of this 1949 will, necessarily related by proponents' witnesses, is subject to many unfavorable inferences. The jury could believe Mr. O. J. Kline, the bank representative, knew Alida, the sole beneficiary of the 1949 will, rather intimately. According to him one of his duties at the bank consisted of "the contacting of accounts and prospective customers * * * [and] naturally I tried to get her [Alida] as an account for the bank." Incidentally he was not too successful for she did not become a customer of the bank until about a year before she died.

Mr. Kline testified that one day he was going past Alida's home so he "casually" dropped in with the thought of getting her as a bank customer in mind. His story continues. Alida was just having a cup of tea so she invited him into the kitchen and on the way introduced him to "Uncle John" who was sitting in the living room. They had a general conversation during the course of which Alida said: " 'I am going to have to make my Will out, where can I get that done?' " He told her their vice-president, Mr. Crawford, would be glad to come out and take care of it and then John Groen, who was still in the living room,

said: " 'I want to make my Will' " and he told him also their Mr. Crawford could come out and take care of the matter. About three weeks later (on November 25, 1949) he received a telephone call from Alida in which she asked: " 'Can you and Mr. Crawford come to the house this afternoon, Uncle John would like to see you?' " He said they could, and that afternoon he and Mr. Crawford went to Alida's home. He did not see Alida but when he knocked he heard her call from somewhere in the house for them to come in. He and Mr. Crawford went back to the kitchen where John Groen was seated at the kitchen table. He introduced Mr. Crawford to John Groen as one "who can help you with your Will if you so desire", and John Groen said he wanted to make out a will and said "he wanted to leave his entire estate to Alida Groen of Rock Rapids, Iowa, his sister-in-law * * * the lady who lived there in that house." Mr. Crawford took some notes and told John Groen the general language of a will and said it would require two witnesses but he and Mr. Kline could act as such witnesses if he desired. Mr. Groen said "he would like to have us as witnesses", so they left and went to the bank where Mr. Crawford typed the will and they returned in about twenty or thirty minutes. This time "we knocked and no one answered, and I opened the door, I was familiar with the house there, and knew that we were expected * * * they were expecting us again of course." They went back to the kitchen where John Groen was seated at the kitchen table in the same place. Mr. Crawford read the will to him and John Groen then signed the will. "It did not take John Groen very long to sign his name. * * * Mr. Groen was not wearing his glasses and when he was engaged in [signing] he stuck the pen through the paper, tore it a little, and he said that he was sorry, and wanted to know if that hurt it or spoiled it, and Mr. Crawford told him that didn't spoil it, that he would just smooth it down, and he did, and then Mr. Groen completed signing it." After he and Crawford signed as witnesses Mr. Crawford offered the will to Mr. Groen, but Mr. Groen said: " 'I don't want it, you take it' ", and he and Mr. Crawford left and went back to the bank where he saw Mr. Crawford place it in the bank vault.

Mr. Kline testified that he had related all of the talk that took place on the afternoon the will was executed. Mr. Crawford could remember quite a little more conversation with respect to the executor or executrix to be named and about the bond and John Groen asking how much he owed him and his payment of $3.00 for drawing the will. But when he was through with his story on direct examination he said he could not recall any other conversation. Later on cross-examination he said he did not ask John Groen if he had a wife or children. He said: "I had been told by someone, and I rather think it was Mr. Kline", that he was a bachelor. He testified he had talked with Kline some little time before November 25, the day Alida called for them to come out, and Kline at that time said "we were supposed to go there some day and draw a Will for Uncle John Groen, Mrs. Alida Groen's brother-in-law, that he was a bachelor." He did not ask John Groen if he had any brothers or sisters or nephews or nieces. He said John Groen was a complete stranger to him and that he had never seen him before. But he said he did not know John Groen was not a resident of Rock Rapids at the time he drew the will. He said: "I did not ask him if he had ever made a Will before, but I put in that clause and told him it would revoke any former Will, if there had been any, but I didn't ask him if he had ever made any former will." He said he did not know Alida Groen but he thought he had seen her once or twice before the date he drew this will. He said this was the first time in his thirty-five years experience of drawing wills for people that he ever drew a will for a complete stranger and then had the signer tell him to keep the will.

Mr. Crawford said he put the will in the bank vault and "gave the matter no thought until Alida Groen died." He said John Groen never was "in any way or to any extent a customer of the bank by mail or anything else", and never inside the bank building. After Alida's death her children, Carl and George, came to the bank to get her lockbox and Mr. Crawford testified he took the box to Alida's home where the family was assembled. He read Alida's will to them and then told the family "that Alida Groen had been named as executrix of that will of John Groen and that due to the fact she had died someone would have to be appointed to act in her place." He was not sure how

he had heard that John Groen had died over in Buffalo Center, the day after Alida died. He thought someone in the bank—just who, he could not remember—had said something to the effect that "John Groen had passed away." He testified he did not tell the children their mother was sole beneficiary of John Groen's will, but without such knowledge the children went ahead and selected Ben and Orvel to act as administrators of John Groen's estate and pursuant to their directions he went to the bank and got John Groen's will and turned it over to the bank's attorney.

I. The foregoing is my review of the evidence in the light most favorable to the contestants. I see nothing in the record that would support the statement that "by his industry, thrift and good judgment he acquired a very comfortable competence." We do not know how he "acquired" his farms. It may be he inherited them. He had the thrift of a bachelor-recluse and this record presents little about his exercising any business judgment. The statements in the majority opinion that he tended to his "business affairs" and that he "attended to the collection of his crop checks at the elevators himself" and that he "usually paid his taxes personally in cash or by checks" are certainly not true of the last four or five years of his life. This man did business out of a sugar sack. He had no checking account until the last year of his life and he only wrote six checks on that. He carried around large amounts of cash. When Alida's oldest son borrowed $1000 from John Groen in 1946 on a 6% note, John, who was then at Johnny Troff's place, gave him the $1000 in $20 bills which he took from a small notebook in his pocket. The majority opinion assumes John Groen paid for his keep in his nieces' homes and Johnny Troff's home during the last ten years of his life. This is because of the evidence of one $600 check to the Honkens. The record is silent as to whether he paid more.

These are the legitimate inferences which I think can be drawn from the foregoing review of the evidence in this case. There certainly could be the finding that John Groen was a fit subject for undue influence at the time the 1949 will was executed. He was then seventy-nine years of age. He was unable to read. He was unable to write except perhaps to write his

name. He was in a weakened mental condition. He could not handle his business. He was unable to retain anything in his mind for more than a few minutes. He was completely helpless physically and at the time the will was made, entirely dependent upon the sole beneficiary of the will, Alida Groen. He was completely unable, both physically and mentally, to make his own arrangements for making the will. The arrangements had to be made for him by the sole beneficiary. The sole beneficiary had early shown some disposition to influence him in that there was evidence from which the jury could find she once before attempted to get him to make a will.

The will was drawn up by entire strangers to John Groen, but one of the parties, the jury could find, was an old friend of the sole beneficiary. The will is most unjust and unnatural. It cut out all of his blood relatives and especially those in the Buffalo Center area who had cared for him in their homes during the last ten years of his life. There is a complete absence in the record of any reason for disinheriting these relatives. He told people outside the family, neighbors and Mr. Boyken, the banker, that they were good to him and when he lay dying he was calling for Anna Honken. There is no evidence that he ever displayed any great affection for Alida. On the contrary, the evidence is that after returning from his visit with her he was excited and glad to get back *home* and he stated "they" wanted his money and wanted to rob him. At the time the will was made there was no discussion as to the testator's blood relatives, as to whether he had a wife, children, or brothers or sisters, or nieces or nephews. The banker who drew the will, who was formerly county treasurer of Lyon County said he thought this 79-year-old man who was a complete stranger to him, and who owned farms in Winnebago and Hancock Counties, was a resident of Rock Rapids—a town of 3000 population. He did not ask him if he had ever executed a will. The jury could find this will was found in the lockbox of the sole beneficiary. Or under the proponents' evidence they could find the almost equally suspicious fact that John Groen never had possession of the will from the moment he signed it and it was found in the custody of a complete stranger. The jury could find that apparently John Groen had no recollection that he had executed the 1949

will, or that the instrument he signed in Alida's kitchen was a will. On the contrary, he retained his 1942 will and it was found in his jacket pocket after his death. He never spoke of the 1949 will and Alida, who knew of the will, never spoke of it to any of her relatives and not even to her own children.

All of these inferences would support a finding that undue influence was exerted in the making of the 1949 will.

II. How is undue influence established in a will contest case? We have often held it need not be established by direct evidence.

In In re Estate of Telsrow, 237 Iowa 672, 677, 22 N.W.2d 792, 796, we said: "Undue influence in cases of this kind may be, and usually is, proven by circumstantial evidence. Direct proof is seldom available." (Citing many Iowa cases)

In In re Estate of Eiker, 233 Iowa 315, 317, 6 N.W.2d 318, 320, we said: "Undue influence may be established by circumstantial evidence."

In In re Will of Busick, 191 Iowa 524, 530, 182 N.W. 815, 818, we said: "* * * but undue influence may be proved circumstantially; indeed, it is seldom capable of other proof."

In In re Estate of Rogers, 242 Iowa 627, 635, 47 N.W.2d 818, 823, we said: "On the other hand, it is well settled that the evidence of undue influence need not be direct."

III. It has been said that four elements should be established in order to raise a jury question on the issue of undue influence, and they are: (1) a person unquestionably subject to undue influence (2) opportunity to exercise such influence (3) a disposition to influence unduly for the purpose of procuring an improper favor, and (4) the result clearly appearing to be the effect of the undue influence. See In re Estate of Ankeny, 238 Iowa 754, 28 N.W.2d 414; 30 Iowa Law Review, 321, 323. It cannot be seriously argued that there was not sufficient proof to establish the first, second and fourth elements. And there is more proof here to establish the third than is usually present in cases of this kind. Not only do we have direct testimony of Alida's statement on an earlier occasion that she intended to get him to draw a will but we have testimony of her arrangement for strangers to draw the will. We have undisputed testimony that John Groen never for a single instant

had possession of this will, and other evidence that the will was found in the lockbox of the sole beneficiary. And add to that the testimony of the statements made by John Groen to many witnesses shortly after he returned home after making this purported will, that his Rock Rapids relatives had tried to rob him.

The jury would not have to believe every word of the bankers' testimony. Many of the circumstances surrounding the drawing of this will were sufficient to arouse suspicion.

Under the evidence most favorable to the contestants we have a helpless, feeble, mentally weak old man invited to the home of one who had the wish and the desire to get him to make a will. We have this man, at the time dependent upon Alida for everything, executing an unnatural will prepared by strangers in which she is the sole beneficiary. The jury could well believe she set the stage and exerted the influence that resulted in this will which never reached John Groen's possession, but was found in the lockbox of the sole beneficiary.

It would unduly extend this opinion to discuss our prior decisions in detail but this case is much like the Telsrow case, supra, Shaw v. Duro, 234 Iowa 778, 14 N.W.2d 241, and In re Will of Soderland, 239 Iowa 569, 30 N.W.2d 128, in all of which we held, on no stronger evidence than is present in this case, that the issue of undue influence was for the jury.

I would reverse.

Hays and Larson, JJ., join in this dissent.